UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ELBERT MITCHELL,                                       :

              Petitioner,                            :          07 Civ.  4688 (LTS) (AJP)

          -against-                                   :          **REPORT AND RECOMMENDATION**

DALE ARTUS, Superintendent,                     :
Clinton Correctional Facility,
                                    :
              Respondent.                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Laura Taylor Swain, United States District Judge:**

              Pro se petitioner Elbert Mitchell seeks a writ of habeas corpus from his January 24,

2002 conviction, after a jury trial in Supreme Court, New York County, of four counts of first degree

murder, one count of second degree murder, one count of second degree burglary, and aggregate

sentence as a persistent violent felony offender of life imprisonment without the possibility of parole.

(Dkt. No. 4: Amended Petition ["Pet."] ¶¶ 1-5; Dkt. No. 9: State Br. at 1-2.)

              Mitchell's habeas petition asserts that:  (1) "[t]he verdict was against the weight of

the evidence" (Pet. ¶ 13(1)); (2) Mitchell's "right to a Fair trial was Abridged when the Prosecutor

violated the unsworn witness rule" (Pet. ¶ 13(2)); (3) Mitchell's "rights to confrontation an[d] Due

process were violated when the [trial court] Barred defense counsel From cross Examing witness[es]

and presenting evidence concerning The Decease[d's] vigorous sexual History with other Males"

2

(Pet. ¶ 13(3)); (4) "Ineffectiveness of trial counsel" (Pet. ¶ 13(4)); (5) "Ineffectiveness of Appella[te] counsel" (Pet. ¶ 13(5)); and (6) "Failure to disclose [a] video cassette of [a] witness who names another man as the killer" (Pet. ¶ 13(6)).

For the reasons set forth below, Mitchell's habeas petition should be <u>DENIED</u>.

## FACTS

### Background

Elbert Mitchell's conviction arose from the June 24 or 25, 1998 robbery, rape, sodomy, and strangulation-murder of eighty-one year old RJJ[1] in her apartment. (<u>See</u> Dkt. No. 9: State Br. at 2; State Br. Appx. A: Mitchell 1st Dep't Br. at 3-4.) Mitchell's fingerprints were identified in RJJ's apartment on her bathroom wall, a glass paperweight, and a container. (State Br. at 2-3; <u>see</u> Mitchell 1st Dep't Br. a 4.) "An employee in the neighborhood grocery store told the police that [Mitchell] tried to sell him a VCR and radio the night before RJJ's body was discovered." (State Br. at 3; <u>see</u> Mitchell 1st Dep't Br. at 4.) DNA test results on the vaginal and anal samples collected from RJJ's body were inconclusive, but "semen recovered from the inner lining of the fur coat draped over RJJ matched [Mitchell's] genetic profile" at a probability of "one in 660 for unrelated blacks, one in 4,400 for whites, one in 800 for Hispanics, and one in 260 for Asians." (State Br. at 3; <u>see</u> Mitchell 1st Dep't Br. at 4.) Another suspect whom Mitchell claimed murdered RJJ was "excluded as a possible source of the semen stain." (State Br. at 3-4.) Mitchell made written and videotaped statements to the police. (<u>See</u> Mitchell 1st Dep't Br. at 4-5; State Br. at 3-4.)

---

[1]     Due to the nature of the crime, the Court will use the victim's initials instead of her name.

3

**Pre-trial Motions**

**Mitchell's Statements to Police**[2]

Justice Bonnie Wittner held a Huntley suppression hearing in May 2001 with respect to Mitchell's motion to suppress statements he made to police over several interviews. (See generally Dkt. No. 10: Huntley Hearing Transcript ["H."]; Dkt. No. 9: State Br. at 3-4; State Br. Appx. A: Mitchell 1st Dep't Br. at 4-5.) In each statement, Mitchell changed his description of events, but maintained his innocence of the murder and sexual assault charges. (See State Br. at 3-4; Mitchell 1st Dep't Br. at 4-5; Mooney: H. 17, 22, 24-35, 38-42, 51-55, 81-97, 185, 189-90.)

After turning himself in to parole officers, on July 7, 1998, Mitchell made his first statements to police at the 125 White Street jail. (See, e.g., State Br. at 3; Mooney: H. 9.) In written statements, Mitchell admitted that he broke into RJJ's apartment through the fire escape, but claimed that he merely saw RJJ lying dead in the bathroom, rummaged through RJJ's belongings with Greg Miller, and helped Greg Miller sell her property on the street. (See State Br. at 3; Mooney: H. 9, 16-19, 26-30, 33-35, 37-42, 51-55, 171-74.) Mitchell denied killing or having any sexual contact with RJJ. (See State Br. at 3; Mooney: H. 16, 22, 35, 42, 52-54, 185, 189-90.) Mitchell also gave a videotaped statement that evening. (See Mooney: H. 55-60, 68-69, 227-31.)

On May 4, 1999, Mitchell made further statements to police while in custody at Sing Sing Correctional Facility for a parole violation. (See State Br. at 4; Mitchell 1st Dep't Br. at 5;

---

[2]    Because the statements were introduced at trial and will be discussed in more detail in that section of this Report and Recommendation, the Huntley hearing testimony will only be briefly summarized.

Mooney: H. 46-47, 69-101, 233-60.) After the police told Mitchell that DNA analysis had been done on samples collected in RJJ's apartment, Mitchell claimed that he and RJJ had been having consensual sexual relations for years, and that he had sex with her in her bathroom on the same day she was murdered, but Mitchell maintained that he did not kill her. (See State Br. at 4; Mitchell 1st Dep't Br. at 5; Mooney: H. 87-97, 240, 250.) Mitchell claimed that when he left RJJ's apartment, she was alive and talking to Greg Miller. (See Mitchell 1st Dep't Br. at 5; Mooney: H. 92, 97, 250-51.) Mitchell also gave a second videotaped statement. (See Mooney: H. 97-101, 115-16, 253, 254-60.)

Justice Wittner denied Mitchell's suppression motion and ruled that Mitchell's statements to the police were admissible. (See State Br. at 4; State Br. Appx. A: Mitchell 1st Dep't Br. at 15.)

### Defense Motion to Redact Mitchell's Videotaped Statements

On September 10, 2001, Mitchell filed a written motion to redact some of A.D.A. Melissa Mourges' comments from the July 7, 1998 and May 4, 1999 videotaped statements. (See Dkt. No. 9: State Br. Appx. A: Mitchell 1st Dep't Br. at 14-15.)

Mitchell argued that the introduction of these comments would "'permit ADA Melissa Mourges to become an unsworn witness against [Mitchell] at trial.'" (Mitchell 1st Dep't Br. at 15.) "'[D]efense counsel asked the court to excise 'all Assistant District [Attorney] Mourges's theories, postulates, opinions, advice, speeches, remarks set fourth [sic] by the prosecutor about what other people said, as contained in the afore said two (2) video tapes and as set forth in the certified copies of the transcriptions thereof.'" (Mitchell 1st Dep't Br. at 15-16.)

On November 27, 2001, Justice Wittner heard oral argument on the redaction motion. (See Dkt. No. 11: 11/27/01 Colloquy ("C.") 1-47.) Justice Wittner stated that most of A.D.A. Mourges' questioning on the videotapes properly "confront[ed] the defendant with his ever changing and inconsistent and evolving statements and also averr[ed] the specific evidence, which you are allowed to do." (C. 10; see also Mitchell 1st Dep't Br. at 20.) However, Justice Wittner ordered that various hearsay statements (see C. 3-11) and information relating to the fact that the second interview session took place at Sing Sing Correctional Facility (see C. 3-5, 12) be redacted from the videotaped statements. (See also Mitchell 1st Dep't Br. at 20.)

### The Prosecution's Motion Pursuant to the Rape Shield Law

A.D.A. Mourges made a motion in limine to preclude any mention of RJJ's alleged sexual activity and history under both C.P.L. § 60.42, New York's Rape Shield Law, and C.P.L. § 60.43, a rule of evidence concerning the admissibility of a victim's sexual conduct in a non-sex offense case. (See Dkt. No. 9: State Br. at 72-76; State Br. Appx. A: Mitchell 1st Dep't Br. at 7-14; C. 16.) The prosecutor told Justice Wittner that defense counsel initially claimed that many residents of RJJ's apartment building could testify that RJJ was sexually active with various partners. (C. 16; see State Br. at 72.) The prosecutor claimed, however, that Det. Mooney canvassed RJJ's building, and found that "not only did nobody confirm that, but, you know, people wanted to punch out whoever was saying that." (C. 16; see also State Br. at 72.) The prosecutor stated that after she told defense counsel about Det. Mooney's investigation, defense counsel stated that Mitchell's witnesses were from neighboring buildings. (C. 16-17; State Br. at 73.) The prosecutor also alleged that defense counsel claimed to have videotaped a witness who stated that RJJ answered her door naked

and had sex with a butcher's delivery man. (C. 17; State Br. at 73.)  The prosecutor made several appointments to see the video, but defense counsel continually postponed the appointments and ultimately refused to allow the prosecutor to view the videotape.  (See State Br. at 73.)

The prosecutor conceded that defense counsel could introduce, as an exception to the Rape Shield Law, any evidence showing specific instances of Mitchell's prior sexual conduct with RJJ.  (See State Br. at 73.)  The prosecutor argued,  however, that evidence of RJJ's sexual history with third parties did not fit under any of the Rape Shield Law's five exceptions.  (See Mitchell 1st Dep't Br. at 8; State Br. at 73.)  The prosecutor claimed that Mitchell should be precluded from introducing evidence pursuant to the Rape Shield Law's "source of semen" exception because DNA evidence and Mitchell's own admission showed that Mitchell was a source of the semen on RJJ. (See State Br. at 73.)  The prosecutor also maintained that Mitchell should be precluded from introducing any evidence pursuant to the Rape Shield Law's "interest of justice" exception because "'sexual activity by an elderly woman is so inherently improbable.'"  (See State Br. at 74.)

Defense counsel opposed the motion, claiming that defense counsel's investigation showed that RJJ was sexually active despite her age, and that RJJ invited "crack heads" and other undesirable individuals into her home.  (C. 23, 25.)  Justice Wittner asked whether the defense at trial would be that "someone else also had sex with [RJJ] and killed her after [Mitchell] had sex with her."  (C.  24.)  Defense counsel responded, "Yes."  (C. 24.)  Justice Wittner replied that the "character of the deceased is never at issue unless you are going to do a justification or something like that, . . . . [T]he character of the deceased, who she let into her home, crack heads, everything [counsel] just said, is precluded."  (C. 25.)  Justice Wittner permitted Mitchell to introduce

admissible evidence that another individual raped and killed RJJ after Mitchell had sex with RJJ, but Justice Wittner stated that "[t]hat doesn't allow you to bring out who she had sex with the prior sixty years of her life." (C. 26.)  Defense counsel argued that the defense's strategy would be unbelievable unless the defense showed that RJJ acted in a manner "discordant with her age." (C. 26-27; see also C. 384.)  Justice Wittner replied that defense counsel would be permitted to call Gregory Miller as a witness or call witnesses that "place him there," but that "the trial cannot turn into a character assassination of [RJJ] or Mr. Gregory Miller." (C. 31, 33.)  Justice Wittner, however, reserved final ruling on the motion. (C. 32, 35, 382.)

After jury selection, Justice Wittner precluded defense counsel during opening statements from mentioning RJJ's life-style, alleged promiscuity and sexual encounters with third parties, because Justice Wittner was reserving on the in limine motion. (C. 386, 389.)  Justice Wittner, however, refused to "definitively preclude" mention of RJJ's promiscuous lifestyle until seeing how the case developed. (C. 386.)  Justice Wittner permitted defense counsel to mention Mitchell's consensual sexual relationship with RJJ in opening statements if the defense planned to introduce admissible evidence supporting that statement. (C. 386-88.)

At trial, Justice Wittner sustained the prosecution's objections when defense counsel asked about RJJ's sexual lifestyle. (See Dkt. No. 13: Trial Transcript ["Tr."] 572-75; Mitchell 1st Dep't Br. at 14 n.3.)

**Mitchell's Trial**

After jury selection on November 27, 2001, testimony in Mitchell's trial began before Justice Wittner on November 29, 2001. (See Dkt. No. 9: State Br. at 4; Dkt. No. 13: Tr. 361.)

**The Prosecution Case at Trial**

At the time of her death, RJJ was eighty-one years old and lived at 660 Nicholas Avenue, apartment twenty-two, in Manhattan. (White: Tr. 433; Tozzi: Tr. 663-64.) RJJ suffered from diabetes and high blood pressure, used a cane or a walker, and wore Depends when she went outside. (White: Tr. 437-43; Charleno: Tr. 614-17, 636, 638.) Two home health aides, Chantal Charleno and Jennifer White, helped care for RJJ. (White: Tr. 432-33; Charleno: Tr. 612-13, 635.) Neither aide had ever met or heard of Mitchell. (White: Tr. 549-50; Charleno: Tr. 660.)

RJJ's apartment was filled with clothing (including a fur coat), jewelry and keepsakes. (White: Tr. 446-47, 492-93, 586-87.) RJJ owned a boombox radio and two televisions, one in the living room and one in the bedroom, which each had a cable box and VCR. (White: Tr. 527, 535, 538, 577-78; Allen: Tr. 872.) RJJ also owned a dog, whose black leash RJJ kept on her bedroom door knob. (White: Tr. 539-41, 548, 580-82; Charleno: Tr. 619.)

On Wednesday, June 24, 1998, Charleno left RJJ's apartment at approximately one p.m. (Charleno: Tr. 613, 619, 648-51.) Charleno returned the following morning at approximately nine a.m and rang RJJ's doorbell multiple times, but no one answered. (Charleno: Tr. 619-22.) The following day, Charleno returned at approximately the same time, but again no one answered the doorbell. (Charleno: Tr. 622-23.) Charleno notified her agency and the building superintendent and left. (Charleno: Tr. 623-26.)

At approximately 10:20 a.m., Police Officers Christopher Tozzi and Edward Garcia received a radio transmission of a "possible female down" at RJJ's apartment, and responded to the scene. (Tozzi: Tr. 662-63, 668, 705-06; Garcia: Tr. 715-16.) The building superintendent gave them the key to RJJ's apartment, but they could not open the door because it was double locked from the inside. (Tozzi: Tr. 668-70; Garcia: Tr. 717-18.) Officers Tozzi and Garcia climbed up the fire escape and entered a closed, but unlocked, window into RJJ's apartment. (Tozzi: Tr. 670, 672-77, 688, 709; Garcia: Tr. 718-21.)

The apartment was a "mess": dresser drawers were open, clothes were scattered throughout, a glass coffee table in front of the window was cracked on top and a lamp near the window lay on the ground. (Tozzi: Tr. 673, 676, 680, 689-90; Garcia: Tr. 721, 737; Rodriguez: Tr. 748; Mooney: Tr. 1169.) The VCRs and cable boxes that sat atop the televisions were missing. (White: Tr. 527, 535; Rodriguez: Tr. 786.)

Officers Tozzi and Garcia discovered RJJ's body in the bathroom, draped face down over the bathtub, covered with a fur coat. (Tozzi: Tr. 678-79, 683-84, 703-04; Garcia: Tr. 721-24, 726-28, 732-34; Rodriguez: Tr. 748, 761.)

Homicide Detectives Robert Mooney and Thomas McCabe and Crime Scene Detective William Rodriguez arrived shortly after. (McCabe: Tr. 1149-1150, 1161; Mooney: Tr. 1168-69; Rodriguez: Tr. 741, 746-47.) Det. Rodriguez lifted twenty-eight fingerprints, including seven from the bathroom walls, two from a glass paperweight on the living room floor and five from a Tupperware container on the living room floor. (Rodriguez: Tr. 777, 785-87, 790-96, 832-33.) Three of the lifted fingerprints – one from the bathroom wall, one from the paperweight and one

10

from the Tupperware – matched Mitchell's fingerprints.  (Gallipani: Tr. 1135-37.)  None of the

fingerprints matched Greg Miller's prints.  (Gallipani: Tr. 1138.)

Medical Examiner Dr. Margaret Prial arrived at the apartment and observed RJJ

"kneeling and hung over the bathtub." (Rodriguez: Tr. 801; Prial: Tr. 991, 995, 997, 1013-14.)  Det.

Rodriguez removed the fur coat from RJJ's body and Dr. Prial swabbed semen off of the back of

RJJ's upper left thigh and vaginal pubic hair.  (Rodriguez: Tr. 801, 805-07; Prial: Tr. 997-99, 1010-

14, 1029.)  Dr. Prial turned RJJ's body face up and discovered a black leash bound tightly around

RJJ's neck and cuts and bruises covering RJJ's face.  (Rodriguez: Tr. 803-05; Prial: Tr. 1001-04.)

Dr. Prial observed several indications that RJJ had been dead for more than twenty-four hours:

maggots inside her anus and vagina, skin slippage, un-stiff muscles and an aroma of decomposing

body.  (Rodriguez: Tr. 802-03; Prial: Tr. 999-1000, 1004-05, 1020-21.)

Det. Rodriguez and Dr. Prial also observed that the bathroom door's wooden saddle

was bloody and that blood was splattered on the bathroom floor; they did not recover the door saddle

for testing because they concluded that the blood on the saddle was RJJ's based on RJJ's "blunt-

impact" facial  injuries and the type of blood spatter around the saddle.  (Rodriguez : Tr.  810-11,

846-48, 857-58; Prial: Tr. 1003-04, 1015, 1023, 1026, 1034-35.)[3/]

On Saturday, June 27, 1998, Senior Medical Examiner Dr. James Gill performed an

autopsy on RJJ and concluded that "ligature strangulation" caused RJJ's death. (Gill: Tr. 1039, 1048,

---

[3/]    In May 2000, Det. Mooney returned to RJJ's apartment to obtain the door saddle.  (Mooney: Tr. 1361-62.)  The Forensic Biology Laboratory at the Medical Examiner's Office tested it but was unable to confirm the "presence of blood on [the] door saddle."  (Prinz: Tr. 1342.)

11

1050-52, 1068, 1077-80, 1109, 1118.)[4] Like Dr. Prial, Dr. Gill determined that RJJ likely died on the evening of June 24, 1998 or the morning of June 25. (Gill: Tr. 1063-64.) Drs. Gill and Prial both concluded that RJJ was sexually assaulted, based on the leash around RJJ's neck, RJJ's positioning in the bathtub, RJJ's facial injuries and the multiple semen deposits on her body. (Prial: Tr. 1006, 1035-36; Gill: Tr. 1075-76.)

When Dets. Robert Mooney and Thomas McCabe learned that Mitchell's fingerprints matched those found at the scene, they searched for him. (Mooney: Tr. 1171-74, 1478; McCabe: Tr. 1151-53.) On Saturday, June 27, 1998, Dets. McCabe and Mooney returned to a neighborhood grocery they had previously canvassed and hung a "wanted poster" of Mitchell. (Bautista: Tr. 963-66, 975-78; McCabe: Tr. 1152-53; Mooney: Tr. 1174-79, 1484.) Upon seeing the poster, the store clerk, Devin Bautista, informed the detectives that Mitchell, a regular customer, tried to sell him a VCR, a "boom box" radio and Walkman headphones on the evening of Thursday, June 25th. (Bautista: Tr. 930-31, 944-45, 958-63, 980-84, 986.)

On July 6, 1998, Mitchell, who had learned that the parole department was searching for him, surrendered to Parole Officer John Richardson. (Richardson: Tr. 912-18, 923.) During the ride to the parole office, Mitchell acknowledged that he was "wanted in a murder," and stated that he was willing to serve his "parole time," but did not want to do any other time for "a crime he didn't commit." (Richardson: Tr. 918, 920, 925-26.) Mitchell also told Richardson that RJJ "was like a mother to him," and that he had only learned of her murder when he asked reporters why they were

---

[4]    Ligature strangulation occurs when a ligature (such as a dog leash) compresses blood vessels in the neck, depriving the brain of oxygen. (Gill: Tr. 1050, 1068-71.)

12

standing outside RJJ's building. (Richardson: Tr. 921.) Mitchell worried that his "fingerprints were in the apartment" because he had done repair work in RJJ's apartment before her death. (Richardson: Tr. 921.) Mitchell "suspected" that his friend murdered RJJ because Mitchell saw his friend's girlfriend wearing RJJ's mink coat. (Richardson: Tr. 921.)

On July 7, 1998, after he was given <u>Miranda</u> warnings, Mitchell made his first statements to Det. Mooney and other detectives. (Mooney: Tr. 1183-88.) Mitchell said he knew that RJJ had been killed, but he had "no further information." (Mooney: Tr. 1188.) Mitchell maintained that he wished he could help because RJJ was his friend. (Mooney: Tr. 1188.)

When Det. Mooney challenged Mitchell's statement as false, Mitchell revised his story. (Mooney: Tr.1188-89.) Mitchell stated that the Wednesday before RJJ was found, "Greg," who Mitchell knew from his block, approached Mitchell at approximately one a.m. and asked Mitchell to help him sell the cable boxes and remotes inside a grocery bag that he was carrying. (Mooney: Tr. 1189-90, 1197.) Mitchell agreed, and they sold the items. (Mooney: Tr. 1189-92, 1197-98.) Afterwards, Greg entered 656 Saint Nicholas Avenue and returned with a large garbage bag containing a mink coat. (Mooney: Tr. 1191, 1198.) The pair walked a few blocks and sold the coat and a gold pendant that Mitchell recognized as belonging to RJJ. (Mooney: Tr. 1190-92, 1198-99.) Mitchell explained that he learned of RJJ's death from "Al," who Mitchell met at the bodega on 141st Street and Saint Nicholas Avenue on June 27, 1998. (Mooney: Tr. 1199.) Det. Mooney wrote out Mitchell's statement, which Mitchell signed, and the statement was read to the jury. (Mooney: Tr. 1194-201.)

Det. Mooney asked Mitchell about his relationship with RJJ. (Mooney: Tr. 1201.) Mitchell replied that RJJ was a close friend, like a "mother" to him, that he saw often. (Mooney: Tr. 1201-04.) Mitchell last saw RJJ on the Monday before she died, when RJJ invited Mitchell up to her apartment to discuss Mitchell's marital problems. (Mooney: Tr. 1204-05.) Before Mitchell left, he used her bathroom. (Mooney: Tr. 1204.) Det. Mooney reduced Mitchell's additional statement to writing, which Mitchell signed. (Mooney: Tr. 1202-05.)

Det. Mooney asked Mitchell whether Mitchell had killed and/or had a sexual relationship with RJJ. (Mooney: Tr. 1205.) Mitchell denied both. (Mooney: Tr. 1205.) Det. Mooney added Mitchell's denial to the written statement, and Mitchell signed it. (Mooney: Tr. 1205.) At Det. Mooney's request, Mitchell provided a saliva sample for DNA testing. (Mooney: Tr. 1206-07, 1237.)

Det. Mooney again challenged the truthfulness of Mitchell's story, telling Mitchell that he could prove that Mitchell was in RJJ's apartment. (Mooney: Tr. 1207-08, 1485-86.) Det. Mooney held up his thumb to indicate they had fingerprint evidence. (Mooney: Tr. 1207-08, 1485-86.) In response, Mitchell, changing his story, said that "what really happened" was that, upon Greg's invitation, Mitchell followed Greg up the fire escape, through an open window, and into RJJ's apartment. (Mooney: Tr. 1208-09, 1217-18.) Once inside, Mitchell saw RJJ, with just her shirt on, draped over the bathtub, with her head covered in water saturated with blood. (Mooney: Tr. 1209-10, 1218.) Mitchell noticed "white stuff" on the back of RJJ's thighs and on her buttocks. (Mooney: Tr. 1220.) Mitchell saw something black on the bathroom floor and "thinks it was the dog's leash." (Mooney: Tr. 1210, 1218-19.) Mitchell emphasized that he "never touched" RJJ or "placed anything

14

over her body." (Mooney: Tr. 1218, 1220.) After seeing RJJ, Mitchell asked Greg, "'Yo, what you did man?,'" and Greg replied, "'It's too late for that.'" (Mooney: Tr. 1210-11, 1219.) After Mitchell and Greg rummaged through RJJ's belongings, Mitchell left. (Mooney: Tr. 1211-14, 1219-20.) On Mitchell's way out, Mitchell observed Greg load a laundry bag with RJJ's VCR, radio, walkman and jewelry. (Mooney: Tr. 1213-14, 1220-21.) As Mitchell neared the window to leave the apartment, he stepped on and broke the glass-top table near the living room window. (Mooney: Tr. 1212, 1220.)

After recounting this new portion of the story, Mitchell explained that the rest of his previous account regarding the sale of the items occurred "just the way [he] told it." (Mooney: Tr. 1213-14, 1221-22.) Det. Mooney wrote down this new statement, which Mitchell signed. (Mooney: Tr. 1213-22.)

At approximately 7:30 p.m., Mitchell made a videotaped statement to Det. Mooney and Assistant District Attorney ("A.D.A.") Melissa Mourges, which was substantially the same as his final written statement. (Mooney: Tr. 1241-43; see Dkt. No. 9: State Br. at 34-35.)[5] Mitchell, however, added that Greg may have masturbated to the sight of RJJ's naked behind, but that the police would probably not find Greg's fingerprints because Greg always put gloves on when he does something "'illegal or legal.'" (State Br. at 35.) Mitchell also reiterated that he had never had a sexual encounter with RJJ. (State Br. at 35.)

---

[5]    This Court has not been supplied with any of the videotaped statements or transcripts thereof. The Court is relying on the State's brief summarizing the videotaped statements.

As a result of Mitchell's statement implicating "Greg," Det. McCabe went to Greg Miller's[6] apartment at 666 Saint Nicholas Avenue on July 7, 1998. (McCabe: Tr. 1158.) Miller agreed to provide hair and blood samples for DNA testing. (McCabe: Tr. 1156-57.) Miller's prints did not match those found in RJJ's apartment. (Gallipani: Tr. 1138.) On July 8, 1998, Det. McCabe retrieved a pair of green sweatpants from Miller's apartment because Mitchell had stated that Greg was wearing green sweatpants when they broke into RJJ's apartment. (McCabe: Tr. 1158; Mooney: Tr. 1221.) Testing of the sweatpants revealed only a spot of Miller's own blood. (Prinz: Tr. 1306-07.) Throughout the investigation, Det. Mooney saw Miller over a dozen times, but never observed Miller wearing or carrying gloves. (Mooney: Tr. 1410.)

Dr. Mechthild Prinz, Assistant Director of the Medical Examiner's Forensic Biology Laboratory, and other forensic biologists conducted DNA testing. (Prinz: Tr. 1256-57.) Semen was present on two stains on the fur coat, RJJ's underwear, the vaginal and rectal samples and the oral, vaginal and anal swabs included in the post-mortem rape kit. (Prinz: Tr. 1290-92, 1312, 1314.) The biologists attempted to create a DNA profile for the semen stains using short tandem repeat ("STR") testing, but the results were inconclusive, except that female DNA from the vaginal and oral swabs and rape kit matched RJJ's DNA profile. (Prinz: Tr. 1262-63, 1292-98, 1314-15.) Since the STR tests were inconclusive, the biologists conducted Y-STR testing, an advanced procedure that

---

[6]     Dets. McCabe and Mooney believed that when Mitchell talked about "Greg," he was referring to Greg Miller, because the detectives had seen Miller on numerous occasions during the course of their investigation. (McCabe: Tr. 1155; Mooney: Tr. 1409-10.) Mitchell later confirmed that Greg was Greg Miller. (See pages 16-17 below.)

examines genetic markers on the male-only Y-chromosome,[7] and were able to formulate a Y-STR profile for the dried semen stain on the fur coat. (Prinz: Tr. 1265, 1279-80, 1298-1303,1327-28, 1332.)[8] The DNA test of the dry semen stain on the coat showed that Mitchell's Y-STR profile was a "match," but that Greg Miller's was not. (Prinz: Tr. 1303-04.)[9] Additionally, Mitchell had another genetic marker, THO-1, that matched the corresponding marker on the fur coat stain. (Prinz: Tr. 1304.) After consulting a population database containing information about individuals with various Y-STR and THO-1 combinations, Dr. Prinz concluded that the likelihood of both a Y-STR and THO-1 match to the stain is one in every 660 unrelated blacks, 4,400 whites, 800 Hispanics, and 260 Asians. (Prinz: Tr. 1304-06.)[10]

        On May 4, 1999, upon learning of the DNA test results, Det. Mooney visited Mitchell at Sing Sing Correctional Facility. (Mooney: Tr. 1365-66.) After <u>Mirandizing</u> Mitchell, Det. Mooney showed Mitchell three photographs of Miller and Mitchell confirmed that Miller was the

---

[7]    A Y-STR profile is not unique to one man. (Prinz: Tr. 1300, 1304-05.) A man's male relatives on the paternal side have the same Y-STR type. (Prinz: Tr. 1300, 1304-05.) Thus, if the Y-STR test shows that a man is a "match," the man may be the source of the stain, but the test "cannot include someone to 100 percent certainty." (Prinz: Tr. 1300, 1304-05, 1335-37.) If the man is not a "match," however, he is excluded to "an absolute certainty." (Prinz: Tr. 1303-04.)

[8]    Dry semen stains, such as the one on the fur coat, may be stable for many years. (Prinz: Tr. 1327.)

[9]    The first DNA test of the fur coat stain did not produce conclusive DNA results, and the third test showed, in addition to a match for Mitchell's DNA, an extract from an unknown male that was not on the sample originally. (Prinz: Tr. 1333-34.)

[10]    Dr. Prinz's sample population, from which she concluded that the probability of another black male having the same Y-STR and THO-1 profile as Mitchell was one in 660, consisted of 128 black males. (Prinz: Tr. 1335-37.)

"Greg" he referred to previously. (Mooney: Tr. 1367-72, 1408-10, 1486-87.) At Det. Mooney's request, Mitchell recounted his version of events, which differed from Mitchell's July 1998 narrative in three significant ways. (Mooney: Tr. 1372-80, 1487.) First, in July 1998, Mitchell stated that he helped Miller sell RJJ's cable boxes and jewelry after he saw her body (see pages 13-14 above), while in May 1999, Mitchell claimed that he sold the items before he saw RJJ's body (Mooney: Tr. 1376-78, 1379-80). Second, in July 1998, Mitchell stated that he sold RJJ's gold pin to a black man on Covent Street, but in May 1999, Mitchell claimed that he sold the pin to an "Arab" store on 145th Street and Saint Nicholas Avenue. (Mooney: Tr. 1380.) Third, in July 1998, Mitchell maintained that he saw the dark rope, which could have been RJJ's dog leash, on the floor (Mooney: Tr. 1210, 1218-19), but in May 1999, Mitchell claimed that the dog leash was around RJJ's neck (Mooney: Tr. 1378).

Det. Mooney showed Mitchell his July 1998 written statement to demonstrate the discrepancies. (Mooney: Tr. 1380-81.) Det. Mooney also showed Mitchell the lab report, which included Mitchell as a possible source of the semen but excluded Miller. (Mooney: Tr. 1381-84, 1488.) Mitchell thought for five minutes, then told Det. Mooney, "okay, this is what really happened." (Mooney: Tr. 1384.) Mitchell explained that although he was thirty-three and RJJ was eighty-one, he and RJJ had maintained a consensual sexual relationship "for years," but that Mitchell did not originally admit that to the police because Mitchell "didn't think [it] would look good" due to their significant age difference. (Mooney: Tr. 1385, 1389-90.) Mitchell said he had sex with RJJ "two or three times a week" in her apartment. (Mooney: Tr. 1385, 1390.) Mitchell stated that his last sexual encounter with RJJ occurred the same day Mitchell sold the items with Greg. (Mooney:

18

Tr. 1385-87, 1390-91.) Mitchell maintained that he and RJJ had sex twice on that day, once on RJJ's

bed and once in the bathroom while RJJ was bending over the bathtub. (Mooney: Tr. 1386-87.)  At

the end of the second encounter, Mitchell ejaculated onto RJJ's back and legs. (Mooney: Tr. 1391.)

Upon leaving RJJ's apartment, Mitchell noticed Greg standing in the doorway.  (Mooney: Tr. 1391-

92.) Mitchell maintained that everything else occurred just as he had described previously. (Mooney:

Tr. 1392.)  Det. Mooney transcribed Mitchell's statement, which Mitchell signed.  (Mooney: Tr.

1388-92.)  Mitchell repeated the statement on video, and the redacted video was played for the jury.

(Mooney: Tr. 1392-94.)

        **Defense Counsel's Objection**

            After the May 4, 1999 video statement was played to the jury, Justice Wittner, sua

sponte, informed counsel (outside of the jury's presence) that she intended to instruct the jury that

Det. Mooney's and A.D.A. Mourges's comments during the video were "just that, opinions, not

evidence, they are not to use it in deciding the [defendant's] guilt or non guilt." (Tr. 1394-95.)

Defense counsel objected to the instruction because defense counsel had moved to redact A.D.A.

Mourges' and Det. Mooney's statements.  (Tr. 1395-96.)

            Justice Wittner delivered the following instruction to the jury about the video

statement:

> [D]uring the course of that [May 4, 1999 videotaped] statement you heard what the
> law refers to as hearsay, things what other people said about the defendant.  It was
> let in, it was inextricably interwoven into the questions.  However, it is not evidence.
> They didn't testify in court.  It is not evidence.  You are to disregard it when you
> decide the guilt or non guilt of the defendant that has to be based upon the evidence
> that you hear in the trial.

Similarly, to the extent this witness Detective Mooney or Ms. Mourges expressed their personal opinions about the guilty or non guilt of the defendant that is like wise not evidence.  My opinion, the lawyers' opinions, that is not evidence.  The evidence is what the witnesses say, the physical exhibits, the stipulations, if any, and your evaluation of the credibility the reliability of the evidence.  Then you apply the law and determine the guilt or non guilt.  I will tell you in my charge, standard charge, the personal opinion of the lawyers, who are advocates in front of you, is not evidence.  The jury must decide the case on the evidence or lack of evidence.

(Tr. 1398-99.)

### The Defense Case at Trial

Mitchell did not present any evidence at trial.  (Tr. 1550.)

### Jury Charge

At the conclusion of the case, Justice Wittner instructed the jury on the fundamental legal principles (including burden of proof beyond a reasonable doubt) and the specific law that applied to this case.  (Charge: Tr. 1650-702.)  In particular, Justice Wittner also instructed the jury that:

You can not consider anything outside of the evidence.  Your own recollection, understanding and evaluation of the evidence at the trial is what controls regardless of what either attorney said about the evidence during the trial or during summations or what I may say about the evidence in the course of the charge or in the course of the trial. . . .

Testimony which was stricken from the record or testimony which was objected to is not in evidence, it must be disregarded by you. . . .

Questions are not evidence.  It is the answers coupled with the questions that constitute evidence.  Inferences or suggestions contained in a question do not render a fact true when the answer negates the suggestion contained in the question. . . .

(Tr. 1650-51,1653, 1661.)

H:\OPIN\MITCHELL-Elbert

**Verdict and Sentence**

On December 12, 2001, the jury convicted Mitchell of four counts of first degree felony murder, one count of second degree murder and one count of second degree burglary, but found Mitchell not guilty of one count of first degree felony murder committed in the course of an oral sodomy.  (Tr. 1747-53.)

On January 10, 2002, Mitchell conceded that he had been convicted twice before for violent felonies, and he was found to be a persistent violent felon.  (Dkt. No. 14: 1/10/02 Tr. at 5-7.)

On January 24, 2002, Mitchell was sentenced, as a persistent violent felony offender, to four concurrent terms of life imprisonment without parole for the first degree murder convictions and concurrent terms of twenty-five years to life for the second degree murder and burglary convictions.  (See Dkt. No. 14: 1/24/02 Sentencing Tr. ["S."] 21-22.)

**Mitchell's Direct Appeal**

Represented by new counsel (the Center for Appellate Litigation), Mitchell appealed to the First Department, claiming that:  (1) "[t]he jury's guilty verdict was against the weight of the evidence . . . and violated due process" (Dkt. No. 9: State Br. Appx. A: Mitchell 1st Dep't Br. at 45-51); (2) Mitchell's "right to a fair trial was abridged when the prosecutor, violating the unsworn witness rule, introduced [Mitchell]'s videotaped statements that included the prosecutor's comments concerning her personal belief in [Mitchell]'s guilt" (id. at 52-58); and (3) Mitchell's "rights to confrontation and due process were violated when the court barred defense counsel from cross-examining witnesses or presenting evidence concerning the deceased's vigorous sexual history with other males" (id. at 58-63).

H:\OPIN\MITCHELL-Elbert

On September 23, 2004, the First Department unanimously affirmed Mitchell's conviction, holding in full:

> The verdict was not against the weight of the evidence. On the contrary, we find the evidence to be overwhelming. There was an extensive chain of circumstantial evidence linking defendant to the crime, which included fingerprint and DNA evidence, consciousness-of-guilt evidence, and evidence of defendant's attempt to sell the victim's property. Furthermore, defendant's statements to the authorities were contradictory, incredible and refuted by other evidence. Although defendant made these statements in an effort to exculpate himself, they actually were highly incriminating.
>
> In order to avoid a violation of the unsworn witness rule, the court should have granted defendant's request to redact from his videotaped statement certain comments made by the prosecutor that could be viewed as expressing an opinion as to defendant's guilt. However, we find that any error in this regard was harmless in light of the court's limiting instruction, which the jury is presumed to have followed, and the fact that the evidence against defendant was overwhelming.
>
> The court properly applied the Rape Shield Law (CPL 60.42) to exclude evidence concerning the deceased's prior sexual history with men other than defendant. In the first place, the record casts doubt on whether defendant actually had any such evidence in admissible, nonhearsay form. In any event, defendant's offer of proof was based on innuendo and speculation, and the proffered evidence lacked any probative value. Accordingly, the court properly concluded that none of the statutory exceptions applied. Moreover, since DNA evidence established, and defendant admitted, that semen found on the deceased belonged to him, evidence concerning a second semen stain was speculative and irrelevant. Since defendant did not assert a constitutional right to introduce any of the excluded evidence, his constitutional argument is unpreserved, and we decline to review it in the interest of justice. Were we to review this claim, we would find no violation of defendant's right to present a defense. Defendant received ample scope within which to assert his claims.

People v. Mitchell, 10 A.D.3d 554, 555-56, 782 N.Y.S.2d 45, 46-47 (1st Dep't 2004) (citations omitted).

22

On November 30, 2004, the New York Court of Appeals denied leave to appeal. People v. Mitchell, 3 N.Y.3d 759, 788 N.Y.S.2d 675 (2004).

**Mitchell's First C.P.L. § 440 Motion**

After Mitchell's First Department appeal was denied, Mitchell filed a pro se C.P.L. § 440.10 motion claiming that he was denied the effective assistance of trial counsel because his attorney failed to call a DNA expert on his behalf, failed to introduce evidence of the victim's sexual history, and failed to exploit the presence of blood on another suspect's pants. (See Dkt. No. 9: State Br. at 6-7; State Br. Appx. G: State Opp. Aff. to Mitchell 1st C.P.L. § 440 Motion ¶¶ 5-7.)[11/]  The prosecution's opposition affidavit argued that Mitchell's claim was "procedurally defective . . . [because Mitchell] failed to provide the court with either an affidavit from counsel or an explanation as to why such an affidavit was unattainable" and that the substance of Mitchell's claims were baseless because Mitchell had "two experienced attorneys representing him," testimony about the victim's sexual activity "was precluded prior to trial," "the minute spot of blood on Miller's sweatpants . . . was Miller's own blood . . . [which] signifies nothing," and Mitchell's attorney "engaged Dr. Lawrence Kobilinsky as a defense expert to scrutinize the laboratory procedures and results obtained . . . [and] did an extensive cross-examination of" the prosecution's expert. (State Opp. Aff. to Mitchell 1st C.P.L. § 440 Motion ¶¶ 3-7.)

On May 27, 2005, Justice Wittner denied the motion "for reasons set forth in the People's response." (State Br. Appx. H: 5/27/05 Justice Wittner Order.)

---

[11/]    Since neither party has provided a copy of Mitchell's first § 440.10 motion, the Court has summarized the motion based on the prosecution's response.

**Mitchell's Second C.P.L. § 440 Motion**

            On August 15, 2005, Mitchell filed a second C.P.L. § 440.10 motion claiming that: (1) Justice Wittner dismissed his first C.P.L. § 440.10 motion not on the merits but "because [Mitchell] fail[ed] to obtain an affidavit or try to obtain an affidavit from his attorney," which he cured by asking his attorney for an affidavit but his attorney failed to respond (Dkt. No. 9: State Br. Appx. I: Mitchell 2d C.P.L. § 440 Motion ¶ 7); (2) trial "counsel fail[ed] to formulate an adequate defense or conduct any kind of meaningful investigation to try to obtain witness(es) or evidence for the defense" (id. ¶ 9); (3) defense counsel told Mitchell "that she had found witnesses that were willing to testify about their first hand knowledge of the deceased's very active and extravagant sex life-style" but counsel never informed Mitchell of any details nor met with the prosecutor to review the information (id. ¶ 10-12); (4) "[d]efense counsel failed to investigate Greg Miller" and failed to explain the "cause for the blood that was on Greg Miller's sweat-pant[s]" (id. ¶ 13); (5) "[d]efense counsel failed to call expert witness with information that totally contradicted the testimony of the State expert witness . . . [and showed] the critical mistakes that the State's lab technicians made doing their testings" (id. ¶ 14); (6) "[d]efense counsel fail[ed] to obtain Brady material from the [P]eople (bloody sandal wood)" (id. ¶ 15); (7) "[d]efense counsel fail[ed] to disclose to the Court a potential witness list for the defense . . . [which] left [Mitchell] without any-kind of defense" (id. ¶ 16); (8) "[d]efense counsel failed to raise a repugnant verdict issue after the jury's verdict was read" (id. ¶ 17); and (9) Justice Wittner violated Mitchell's right to a fair trial by stating at the Huntley hearing "that if there ever was a[n] ineffectiveness claim brought against defense counsel, that she would testify in defense counsel[']s behalf" (id. ¶ 18).

On October 13, 2005, Justice Wittner, citing the prosecutor's opposition, denied Mitchell's second C.P.L. § 440 motion because "[d]efendant has failed to provide the court with an affidavit from counsel and, in any event, his claim is without merit." (State Br. Appx. K: 10/13/05 Justice Wittner Order.) Mitchell sought leave to appeal to the First Department. (State Br. Appx. L: 10/30/05 Motion for Leave to Appeal.) On April 11, 2006, the First Department denied leave to appeal because "there is no question of law or fact presented which ought to be reviewed by the Appellate Division." (State Br. Appx. N: 4/11/06 1st Dep't Order.)

**Mitchell's Coram Nobis Petition**

On May 19, 2006, Mitchell applied to the First Department for a writ of error coram nobis on the grounds that his appellate counsel was ineffective for failing to argue that: (1) trial counsel was ineffective for "failure to conduct her own pretrial investigation to obtain witnesses and evidence, counsel's [f]ailure to call D.N.A. expert witness, counsel's failure to provide a potential witness list[,] [c]ounsel's [f]ailure to provide a video cassette of a witness, [and] counsel relied only on the information she received" (State Br. Appx. O: Mitchell Coram Nobis Pet. at 4a, 8a-8b); (2) the prosecutor failed to timely disclose Brady and Rosario material (id. at 8c); (3) the trial judge's statement during the Huntley hearing about trial counsel's performance "prejudice[d]" Mitchell and deprived Mitchell of his "rights to a [f]air trial and due process" (id.); and (4) Mitchell was unconstitutionally sentenced as a persistent felon (id. at 9a).

On October 5, 2006, the First Department denied Mitchell's coram nobis petition without opinion. (See Dkt. No. 9: State Br. at 9.)

**Mitchell's Federal Habeas Corpus Petition**

Mitchell's pro se amended habeas corpus petition asserts that: (1) "[t]he verdict was against the weight of the evidence" (Dkt. No. 4: Pet. ¶ 13(1)); (2) Mitchell's "right to a Fair trial was Abridged when the Prosecutor violated the unsworn witness rule" (Pet. ¶ 13(2)); (3) Mitchell's "rights to confrontation an[d] Due process were violated when the [trial court] Barred defense counsel From cross examing witness[es] and presenting evidence concerning The Decease[d's] vigorous sexual History with other Males" (Pet. ¶ 13(3)); (4) "Ineffectiveness of trial counsel" (Pet. ¶ 13(4)); (5) "Ineffectiveness of appella[te] counsel" (Pet. ¶ 13(5)); and (6) "[F]ailure to disclose [a] video cassette of [a] witness who names another man as the killer" (Pet. ¶ 13(6)).

## ANALYSIS

### I.    THE AEDPA REVIEW STANDARD

Before the Court can determine whether petitioner is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners."  Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000).  The AEDPA imposed a more stringent review standard, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[12]

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." Williams v. Taylor, 529 U.S. at 404-05, 120 S. Ct. at 1519.[13] Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." Williams v. Taylor, 529 U.S. at 412, 120 S. Ct. at 1523.[14] "That federal law, as defined by the

---

[12]    See also, e.g., Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004); Dallio v. Spitzer, 343 F.3d 553, 559-60 (2d Cir. 2003), cert. denied, 541 U.S. 961, 124 S. Ct. 1713 (2004); Eze v. Senkowski, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'") (quoting Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001), cert. denied, 535 U.S. 1019, 122 S. Ct. 1611 (2002)).

[13]    Accord, e.g., Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir.), cert. denied, 540 U.S. 1091, 124 S. Ct. 962 (2003); Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000); Lurie v. Wittner, 228 F.3d 113, 125 (2d Cir. 2000), cert. denied, 532 U.S. 943, 121 S. Ct. 1404 (2001); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000), cert. denied, 531 U.S. 1116, 121 S. Ct. 865 (2001).

[14]    Accord, e.g., Carey v. Musladin, 549 U.S. 70, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from the Court regarding this [issue], it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"); Yarborough v. Alvarado, 541 U.S. 652, 659, 124 S. Ct. 2140, 2147 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); Wiggins v. Smith, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); Lockyer v. Andrade, 538 U.S. 63, 72, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as
(continued...)

Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law

or a bright-line rule designed to effectuate such a standard in a particular context."  Kennaugh v.

Miller, 289 F.3d at 42.  "A petitioner can not win habeas relief solely by demonstrating that the state

court unreasonably applied Second Circuit precedent."  Yung v. Walker, 341 F.3d at 110; accord,

e.g., Rodriguez v. Miller, 499 F.3d at 140; DelValle v. Armstrong, 306 F.3d at 1200.

> As to the "contrary to" clause:
>
> A state-court decision will certainly be contrary to [Supreme Court] clearly
> established precedent if the state court applies a rule that contradicts the governing
> law set forth in [Supreme Court] cases. . . .  A state-court decision will also be
> contrary to [the Supreme] Court's clearly established precedent if the state court
> confronts a set of facts that are materially indistinguishable from a decision of [the
> Supreme] Court and nevertheless arrives at a result different from [Supreme Court]
> precedent.

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[15/]

---

14/    (...continued)
of the time of the relevant state-court decision.'"); Rodriguez v. Miller, 499 F.3d 136, 140
(2d Cir. 2007) ("'Clearly established federal law' refers only to the holdings of the Supreme
Court.  No principle of constitutional law grounded solely in the holdings of the various
courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas
relief.  Leading by example, Musladin admonishes courts to read the Supreme Court's
holdings narrowly and to disregard as dicta for habeas purposes much of the underlying logic
and rationale of the high court's decisions.") (citations & fn. omitted), cert. denied, 128 S. Ct.
1655 (2008); Howard v. Walker, 406 F.3d at 122; Tueros v. Greiner, 343 F.3d 587, 591 (2d
Cir. 2003), cert. denied, 541 U.S. 1047, 124 S. Ct. 2171 (2004); Parsad v. Greiner, 337 F.3d
at 181; DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002); Yung v. Walker, 341
F.3d 104, 109-110 (2d Cir. 2003); Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir.), cert.
denied, 537 U.S. 909, 123 S. Ct. 251 (2002); Loliscio v. Goord, 263 F.3d 178, 184 (2d Cir.
2001); Sellan v. Kuhlman, 261 F.3d 303, 309 (2d Cir. 2001).

15/    Accord, e.g., Brown v. Payton, 544 U.S. 133, 125 S. Ct. 1432, 1438-39 (2005); Bell v. Cone,
543 U.S. 447, 452-53, 125 S. Ct. 847, 851 (2005); Price v. Vincent, 538 U.S. 634, 640, 123
(continued...)

28

In <u>Williams</u>, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 413, 120 S. Ct. at 1523.[16/]  However, "[t]he term 'unreasonable' is . . . difficult to define." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 410, 120 S. Ct. at 1522.  The Supreme Court made clear that "an <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law."  <u>Id</u>.[17/]  Rather, the issue is "whether the state court's

---

[15/]    (...continued)
S. Ct. 1848, 1853 (2003); <u>Lockyer</u> v. <u>Andrade</u>, 123 S. Ct. at 1173-74; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d 238, 242 (2d Cir. 2006), <u>cert. denied</u>, 127 S. Ct. 1267 (2007); <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d 210, 219 (2d Cir.), <u>cert. denied</u>, 546 U.S. 889, 126 S. Ct. 215 (2005); <u>Tueros</u> v. <u>Greiner</u>, 343 F.3d at 591; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200; <u>Yung</u> v. <u>Walker</u>, 341 F.3d at 109; <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d at 42; <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d at 184; <u>Lurie</u> v. <u>Wittner</u>, 228 F.3d at 127-28.

[16/]    <u>Accord</u>, <u>e.g.</u>, <u>Brown</u> v. <u>Payton</u>, 544 U.S. at 141, 125 S. Ct. at 1439; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2534-35; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d 238, 246 (2d Cir. 2006), <u>cert. denied</u>, 127 S. Ct. 1383 (2007); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181.

[17/]    <u>See also</u>, <u>e.g.</u>, <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained: '[A] federal habeas court may not issue the writ simply because that court concludes that the state-court decision applied [a Supreme Court case] incorrectly.'") (quoting <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360 (2002)); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 219; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 124-25; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

application of clearly established federal law was objectively unreasonable." <u>Williams</u> v. <u>Taylor</u>,

529 U.S. at 409, 120 S. Ct. at 1521.[18/]  "Objectively unreasonable" is different from "clear error."

<u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness.").  However,

the Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is

required . . . the increment need not be great; otherwise, habeas relief would be limited to state court

decisions so far off the mark as to suggest judicial incompetence.'" <u>Jones</u> v. <u>Stinson</u>, 229 F.3d at 119

(quoting <u>Francis S.</u> v. <u>Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000)).[19/]  "[T]he range of reasonable

judgment can depend in part on the nature of the relevant rule." <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S.

at 663, 124 S. Ct. at 2149.[20/]  "Even if the state court issues a decision 'contrary to' clearly established

---

[18/]    Accord, <u>e.g.</u>, <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520-21, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853; <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1174-75; <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. at 25-27, 123 S. Ct. at 360-61; <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d 515, 519 (2d Cir. 2006), <u>cert. denied</u>, 128 S. Ct. 75 (2007); <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 125; <u>Ryan</u> v. <u>Miller</u>, 303 F.3d 231, 245 (2d Cir. 2002); <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d at 184; <u>Lurie</u> v. <u>Wittner</u>, 228 F.3d at 128-29.

[19/]    Accord, <u>e.g.</u>, <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 219; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197, 200-01; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 125; <u>Ryan</u> v. <u>Miller</u>, 303 F.3d at 245; <u>Yung</u> v. <u>Walker</u>, 341 F.3d at 110; <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d at 184.

[20/]    The Supreme Court explained:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule may be plainly correct or incorrect.  Other rules are more general, and their meaning
> (continued...)

February 25, 2008 Supreme Court law, . . . a petitioner 'cannot obtain relief . . . unless application of a *correct* interpretation of that [Supreme Court] decision leads to the conclusion that his rights were violated.'" Cousin v. Bennett, 511 F.3d 334, 339 (2d Cir. 2008).

Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." Kennaugh v. Miller, 289 F.3d at 45.[21]

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d at 109; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Mosby v. Senkowski, 470 F.3d at 519.

---

[20]    (...continued)

must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. at 663, 124 S. Ct. at 2149; accord, e.g., Rodriguez v. Miller, 499 F.3d at 143; Hawkins v. Costello, 460 F.3d at 243.

[21]    Accord, e.g., Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; see Yarborough v. Alvarado, 541 U.S. at 665-66, 124 S. Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision.  There is force to this argument.  Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.  At the same time, the difference between applying a rule and extending it is not always clear.  Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.") (citations omitted).

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

Sellan v. Kuhlman, 261 F.3d at 312; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853 ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."); Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); Mosby v. Senkowski, 470 F.3d at 519; Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 220; Wade v. Herbert, 391 F.3d 135, 140 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'" "Such a summary determination, even absent citation of federal case law, is a determination 'on the merits' and as such requires the deference specified by § 2254." Moreover, "if any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir.) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies.), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004); Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir. 2002) ("In Sellan, we found that an even more concise Appellate Division

disposition – the word 'denied' – triggered AEDPA deference."); but cf. Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (A "contrary-to-fact construction is not the same as an alternative holding. . . . We decline to read a contingent observation as an 'adjudication on the merits.'"  De novo review applies in such a case.).

Where the state court decision is not clear as to whether it rests on federal law or state procedural law, the Second Circuit in Jimenez v. Walker, 458 F.3d 130, 145-46 (2d Cir. 2006), cert. denied, 127 S. Ct. 976 (2007), instructed that the court must "examine the three clues laid out in Coleman, Quirama and Sellan" – that is, "(1) the face of the state-court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances." Jimenez v. Walker, 458 F.3d at 145 & n.16; accord, e.g., Clark v. Perez, 510 F.3d 382, 394 (2d Cir. 2008).  Using these three factors, the court should

classify the decision as either:

> (1)    fairly appearing to rest primarily on federal law or to be interwoven with federal law or
>
> (2)    fairly appearing to rest primarily on state procedural law.

Absent a clear and express statement of reliance on a state procedural bar, the Harris presumption applies to decisions in the first category and deems them to rest on the merits of the federal claim.  Such decisions are not procedurally barred and must be afforded AEDPA deference as adjudications "on the merits" under 28 U.S.C. § 2254(d).  The Harris presumption does not apply to decisions in the second category, which show themselves to rest on an independent state procedural bar.  Nor does it apply to decisions in the first category which contain a clear statement of reliance on a state procedural bar.  No AEDPA deference is due to these decisions, but the state may successfully assert that habeas relief is foreclosed provided that the independent state procedural bar is adequate to support the judgment and that neither cause and prejudice nor a fundamental miscarriage of justice is shown.

> The effect of these rules is to present federal habeas courts with a binary circumstance: we either apply AEDPA deference to review a state court's disposition of a federal claim or refuse to review the claim because of a procedural bar properly raised. The middle ground . . . does not exist.

Jimenez v. Walker, 458 F.3d at 145-46 (citations & fns. omitted); accord, e.g., Hawkins v. Costello, 460 F.3d at 242 ("In Jimenez v. Walker, we recently made clear that when a state court rejects a petitioner's claim as either unpreserved or without merit, the conclusive presumption is that the adjudication rested on the merits."). Of course, "[i]f there is no [state court] adjudication on the merits [and no procedural bar], then the pre-AEDPA, de novo standard of review applies." Cotto v. Herbert, 331 F.3d 217, 230 (2d Cir. 2003); see also Jimenez v. Walker, 458 F.3d at 145 n.17.

Finally, "[i]f [the] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." Howard v. Walker, 406 F.3d at 122.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations: "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); accord, e.g., Lynn v. Bliden, 443 F.3d at 246-47; Rosa v. McCray, 396 F.3d at 220. "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'" Parsad v. Greiner, 337 F.3d at 181 (quoting § 2254(e)(1)); accord, e.g., Lynn v. Bliden, 443 F.3d at 246-47.

34

## II.     MITCHELL'S WEIGHT OF THE EVIDENCE CLAIM IS NOT COGNIZABLE ON HABEAS REVIEW

Mitchell's habeas petition claims that his conviction was against the weight of the evidence.  (Dkt. No. 4: Pet. ¶ 13(1).)

The First Department held that "[t]he verdict was not against the weight of the evidence.  On the contrary, we find the evidence to be overwhelming."  People v. Mitchell, 10 A.D.3d 554, 555, 782 N.Y.S.2d 45, 46-47 (1st Dep't 2004).   The First Department noted the "extensive chain of circumstantial evidence linking [Mitchell] to the crime" and Mitchell's "highly incriminating," "contradictory, incredible" statements that were "refuted by other evidence."  Id.

### A.     A Weight of the Evidence Claim is not Cognizable on Habeas Review

A challenge to a verdict based on the weight of the evidence differs from one based on the sufficiency of the evidence:  "[T]he 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles."  Garbez v. Greiner, 01 Civ. 9865, 2002 WL 1760960 at *8 (S.D.N.Y. July 30, 2002) (citing People v. Bleakley, 69 N.Y.2d 490, 515 N.Y.S.2d 761 (1987)).[22/]

---

[22/]     The New York Court of Appeals in Bleakley explained the difference as follows:

> Although the two standards of intermediate appellate review – legal sufficiency and weight of evidence – are related, each requires a discrete analysis. For a court to conclude . . . that a jury verdict is supported by sufficient evidence, the court must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged.  If that is satisfied, then the verdict will be upheld by the intermediate appellate court on that review basis.
>
> (continued...)

It is well-settled that a weight of the evidence claim is not cognizable on federal habeas review. E.g., Young v. Kemp, 760 F.2d 1097, 1105 (11th Cir. 1985) ("A federal habeas court has no power to grant habeas corpus relief because it finds that the state conviction is against the 'weight' of the evidence . . ."), cert. denied, 476 U.S. 1123, 106 S. Ct. 1991 (1986); Ex parte Craig, 282 F. 138, 148 (2d Cir. 1922) ("a writ of habeas corpus cannot be used to review the weight of evidence . . . "), aff'd, 263 U.S. 255, 44 S. Ct. 103 (1923); Morales v. Artus, 05 Civ. 3542, 2006 WL 3821488 at *19-20 (S.D.N.Y. Dec. 28, 2006) (Peck, M.J.); Guerrero v. Tracey, 425 F. Supp. 2d 434, 447 (S.D.N.Y. 2006); Rosario v. Walsh, 05 Civ. 2684, 2006 WL 1431410 at *18-19 (S.D.N.Y. May 25, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 1880958 (S.D.N.Y. July 5, 2006); Nelson v. Sears, 05 Civ. 10341, 2006 WL 775123 at *8-9 (S.D.N.Y. Mar. 28, 2006); Olivo v. Thorton, 05 Civ. 3237, 2005 WL 3292542 at *13-14 (S.D.N.Y. Dec. 6, 2005) (Peck, M.J.), report & rec. adopted, 2007 WL 162295 (S.D.N.Y. Jan. 19, 2007); Roman v. Filion, 04 Civ. 8022, 2005 WL 1383167 at *30-31 (S.D.N.Y. June 10, 2005) (Peck, M.J.); Feliz v. Conway, 378 F. Supp. 2d 425, 430 n.3 (S.D.N.Y. 2005); Brown v. Fischer, 03 Civ. 9818, 2004 WL 1171277 at *6 (S.D.N.Y. May 27, 2004)

---

22/      (...continued)

To determine whether a verdict is supported by the weight of the evidence, however, the appellate court's dispositive analysis is not limited to that legal test. Even if all the elements and necessary findings are supported by some credible evidence, the court must examine the evidence further. If based on all the credible evidence a different finding would not have been unreasonable, then the appellate court must, like the trier of fact below, "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony."

People v. Bleakley, 69 N.Y.2d at 495, 515 N.Y.S.2d at 763 (citations omitted).

(Peck, M.J.); Rodriguez v. Senkowski, 03 Civ. 3314, 2004 WL 503451 at *26-27 & n.33 (S.D.N.Y.

Mar. 15, 2004) (Peck, M.J.) (citing my prior decisions); Glisson v. Mantello, 287 F. Supp. 2d 414,

441 (S.D.N.Y. 2003); Pitter v. Fischer, 234 F. Supp. 2d 342, 349 n.6 (S.D.N.Y. 2002); Garbez v.

Greiner, 2002 WL 1760960 at *8 ("by raising a 'weight of the evidence' argument, [petitioner] does

not present to this Court a federal claim as required by 28 U.S.C. § 2254(a).  Instead, [petitioner]

raises an error of state law, which is not available for habeas corpus review."); Lemons v. Parrott,

01 Civ. 9366, 2002 WL 850028 at *3 (S.D.N.Y. May 2, 2002) ("[W]e have no authority to review

a weight of the evidence argument because it is a state law claim."); McBride v. Senkowski, 98 Civ.

8663, 2002 WL 523275 at *4 n.2 (S.D.N.Y. Apr. 8, 2002) (weight of evidence is not cognizable on

habeas review).[23/]

        Accordingly, Mitchell's weight of the evidence habeas claim should be DENIED.

---

[23/]    See also, e.g., Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles. Accordingly, the Court is precluded from considering the [weight of the evidence] claim.") (citations omitted); Peralta v. Bintz, 00 Civ. 8935, 2001 WL 800071 at *5 (S.D.N.Y. July 16, 2001) (Petitioner "raises only the state law issue of whether the weight of the evidence supported his conviction. Because [petitioner] raises no cognizable federal issue, his petition must be denied."); Kearse v. Artuz, 99 Civ. 2428, 2000 WL 1253205 at *1 (S.D.N.Y. Sept. 5, 2000) ("Disagreement with a jury verdict about the weight of the evidence is not grounds for federal habeas corpus relief."); Rodriguez v. O'Keefe, 96 Civ. 2094, 1996 WL 428164 at *4 (S.D.N.Y. July 31, 1996) ("A claim that the verdict was against the weight of the evidence is not cognizable on habeas review."), aff'd, No. 96-2699, 122 F.3d 1057 (table) (2d Cir. Sept. 9, 1997), cert. denied, 522 U.S. 1123, 118 S. Ct. 1068 (1998); cf., Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) (dismissing habeas claim; "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments of both of these issues").

37

**B.    To The Extent Mitchell Raises A Sufficiency Of The Evidence Claim, That Claim is Meritless**

Mitchell's brief to the First Department and Mitchell's letter requesting leave to appeal to the New York Court of Appeals cited <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. 307, 99 S. Ct. 2781 (1979), a case dealing with sufficiency of the evidence.  (<u>See</u> Dkt. 9: State Br. Appx. A: Mitchell 1st Dep't Br. at 45, 51; State Br. Appx. D: 10/25/04 Mitchell Leave Letter.)  To the extent that Mitchell's first habeas claim can be liberally construed to also allege a sufficiency of the evidence claim, that claim nevertheless would be without merit.

**1.    Legal Principles Governing Sufficiency of the Evidence Habeas Claims**

"'[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. 307, 315, 99 S. Ct. 2781, 2787 (1979) (quoting <u>In re Winship</u>, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970)).  However, "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. at 317, 99 S. Ct. at 2788.  Accordingly, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 – if the settled procedural prerequisites for such a claim have otherwise been satisfied – the applicant is entitled to habeas corpus relief if it is found that upon the record evidence

adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable

doubt." Jackson v. Virginia, 443 U.S. at 324, 99 S. Ct. at 2791-92.[24]

        The petitioner bears a very heavy burden:

> [T]he standard for appellate review of an insufficiency claim placed a  "very heavy
> burden" on the appellant.  Our inquiry is whether the jury, drawing reasonable
> inferences from the evidence, may fairly and logically have concluded that the
> defendant was guilty beyond a reasonable doubt.  In making this determination, we
> must view the evidence in the light most favorable to the government, and construe
> all permissible inferences in its favor.

United States v. Carson, 702 F.2d 351, 361 (2d Cir.) (citations omitted), cert. denied, 462 U.S. 1108,

103 S. Ct. 2456, 2457 (1983).[25]

        The habeas court's review of the jury's findings is limited:

---

[24]    Accord, e.g., Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000); Einaugler
v. Supreme Court, 109 F.3d 836, 839 (2d Cir. 1997).

[25]    Accord, e.g., Fama v. Comm'r of Corr. Servs., 235 F.3d at 811 ("petitioner bears a very heavy
burden in convincing a federal habeas court to grant a petition on the grounds of
insufficiency of the evidence"); United States v. Middlemiss, 217 F.3d 112, 117 (2d Cir.
2000); United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) ("a defendant shoulders
a 'heavy burden' in challenging the sufficiency of evidence supporting a conviction"); United
States v. Kinney, 211 F.3d 13, 16 (2d Cir. 2000), cert. denied, 531 U.S. 1079, 121 S. Ct. 778
(2001); United States v. Bicaksiz, 194 F.3d 390, 398 (2d Cir. 1999) (The defendant "bears
a 'very heavy burden' in challenging the sufficiency of the evidence that led to his conviction.
In considering any such challenge, we view all proof in the light most favorable to the
government and draw all reasonable inferences in the government's favor.") (citations
omitted), cert. denied, 528 U.S. 1161, 120 S. Ct. 1175 (2000); United States v. Russo, 74
F.3d 1383, 1395 (2d Cir.), cert. denied, 519 U.S. 927, 117 S. Ct. 293 (1996); United States
v. Rosa, 11 F.3d 315, 337 (2d Cir. 1993) ("[T]he defendant who makes a sufficiency
challenge bears a heavy burden."), cert. denied, 511 U.S. 1042, 1096, 114 S. Ct. 1565, 1864
(1994); United States v. Strauss, 999 F.2d 692, 696 (2d Cir. 1993) (burden on defendant
claiming insufficiency is "very heavy" and all inferences must be drawn in the government's
favor).

> [T]his inquiry does not require a court to "ask itself whether <u>it</u> believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

<u>Jackson</u> v. <u>Virginia</u>, 443 U.S. at 318-19, 99 S. Ct. at 2789 (citations omitted).<u>26/</u>

The <u>Jackson</u> v. <u>Virginia</u> "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. at 324 n.16, 99 S. Ct. at 2792 n.16; <u>accord</u>, <u>e.g.</u>, <u>Green</u> v. <u>Abrams</u>, 984 F.2d 41, 44-45 (2d Cir. 1993) ("In considering a petition for a writ of habeas corpus based on insufficient evidence to support a criminal conviction in the state courts, a federal court must look to state law to determine the elements of the crime.").

## 2.    <u>Application of the Standard to Mitchell's Conviction</u>

Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found beyond a reasonable doubt that Mitchell raped and strangled RJJ to death.<u>27/</u> While the People's case relied on circumstantial evidence and Mitchell's inconsistent and conflicting statements, a rational jury could have found that, combined, this evidence proved beyond a

---

<u>26/</u>    Accord, <u>e.g.</u>, <u>United States</u> v. <u>Middlemiss</u>, 217 F.3d at 117; <u>United States</u> v. <u>Kinney</u>, 211 F.3d at 16; <u>United States</u> v. <u>Russo</u>, 74 F.3d at 1395 (quoting <u>United States</u> v. <u>Martinez</u>, 54 F.3d 1040, 1042-43 (2d Cir.), <u>cert. denied</u>, 516 U.S. 1001, 116 S. Ct. 545 (1995)); <u>Mallette</u> v. <u>Scully</u>, 752 F.2d 26, 31 (2d Cir. 1984).

<u>27/</u>    Mitchell's brief to the First Department focused entirely on whether Mitchell was the perpetrator and did not dispute that RJJ was strangled to death. (<u>See</u> Dkt. 9: State Br. Appx. A: Mitchell 1st Dep't Br. at 47.)

reasonable doubt that Mitchell was the perpetrator.  (See pages 8-18 above.)  Three of Mitchell's fingerprints were found inside RJJ's apartment, one of which was on the bathroom wall.  (See pages 9-10 above.)  Additionally, while Greg Miller, who Mitchell accused of killing RJJ, was excluded as the source of the semen on the fur coat, Mitchell's Y-STR and THO-1 DNA profiles were a match. (See pages 12-14, 16, 18 above.)  Also, Mitchell attempted to sell to David Bautista, a neighborhood grocery store clerk, a VCR, boom box radio and Walkman headphones on Thursday, June 25th.  (See pages 11-12 above.)  Not coincidentally, RJJ's VCR was missing from her apartment on Friday, June 26th.  (See page 9 above.)

Mitchell's constantly changing story also demonstrated Mitchell's consciousness of guilt.  At the first interview, Mitchell maintained that he had no knowledge as to how RJJ died.  (See page 12 above.)  The following day, he admitted to selling RJJ's property with Greg Miller.  (See page 12 above.)  Later in the day, Mitchell added to his story that he and Greg broke into RJJ's apartment.  (See page 13 above.)   Throughout his July 7, 1998 statement, Mitchell consistently maintained that he had never had a sexual relationship with RJJ; by the conclusion of the May 4, 1999 interview, however, Mitchell claimed that he had a long-term, ongoing sexual relationship with RJJ, despite the eighty-one year old RJJ's deteriorating health requiring her to wear Depends and use a cane or a walker, and despite her home health aides' testimony that they never saw Mitchell at RJJ's apartment.  (See pages 8, 12-14, 17 above.)

Additionally, there were inconsistencies in Mitchell's different statements.  For instance, Mitchell told his parole officer that he learned of RJJ's death when he asked reporters why they were standing outside RJJ's building.  (See pages 11-12 above.)  The next day, Mitchell told

Det. Mooney that he learned of RJJ's death from "Al" at the bodega.  (See page 12 above.)  In July 1998, Mitchell claimed that he sold property with Miller after he saw RJJ's dead body (see pages 13-14 above); in May 1999, however, Mitchell stated that he sold property with Miller before he saw RJJ's dead body (see page 17 above).  In July 1998, Mitchell maintained that he saw the dog leash on the floor; in May 1999, Mitchell told Det. Mooney that he saw the leash around RJJ's neck.  (See page 17 above.)

Mitchell's various accounts, while aimed at exculpating himself, actually corroborated that he was the perpetrator.  (See pages 11-14, 17-18 above.)  Even in Mitchell's first set of statements on July 7, 1998, Mitchell acknowledged that there was "white stuff" on the back of RJJ's thighs and on her buttocks.  (See page 13 above.)  Mitchell's May 1999 statements admitted that he had sex with RJJ in the bathroom and ejaculated onto her back and legs.  (See page 18 above.)

Mitchell argued to the First Department that the jury "was overly impressed with inconclusive DNA evidence" because the Y-STR profile match on the dried semen stain on the coat did not prove that the semen was deposited when RJJ died.  (Mitchell 1st Dep't Br. at 48.)  Rather, since the semen stain was dry and "dry semen stains can be stable for years," Mitchell argued that "it [is] entirely possible" that Mitchell could have deposited the semen long before RJJ's death, which would have been consistent with Mitchell's May 4, 1999 statement.  (Mitchell 1st Dep't Br. at 48.)  Mitchell additionally argued that, because the Y-STR and THO-1 tests do not determine to a statistical certainty the source of the semen, Mitchell may not have been the source of the semen.  (See Mitchell's 1st Dep't Br. at 49.)  Whether the jury was "overly impressed" with the DNA evidence concerning the stain on the coat, however, is unimportant because Mitchell admitted in his

May 4, 1999 statement that he had sex with RJJ and ejaculated onto her back on the same day that

he and Greg broke into RJJ's apartment and sold items. (See pages 17-18 above.)  Moreover, that is

an argument going to the weight of the evidence, not its sufficiency.  Mitchell additionally claimed

that "there were troubling gaps in the People's proof," such as the failure to test the dog leash for

DNA evidence, the failure to voucher and immediately test the red bandana, the bed sheets, the blood

on the floor and the dry semen stain on the victim's thigh, and the failure to match many of the

fingerprints to specific individuals.  (Mitchell 1st Dep't Br. at 49-50.)  While these alleged failures,

many of which were explained, may be pertinent to a State weight of the evidence claim, they do not

affect this Court's sufficiency of the evidence analysis as to whether a rational jury could have

decided that Mitchell was the perpetrator beyond a reasonable doubt given the evidence admitted at

trial.

    Mitchell's weight/sufficiency of the evidence habeas claim should be <u>DENIED</u>.

## III. MITCHELL'S HABEAS CLAIM THAT THE PROSECUTOR VIOLATED THE "UNSWORN WITNESS" RULE SHOULD BE DENIED

    Mitchell's habeas petition claims that the prosecutor abridged his constitutional right

to a fair trial by violating the "unsworn witness" rule.  (Dkt. No. 4: Pet. ¶ 13(2).)  On direct appeal,

Mitchell contended that the unsworn witness rule was violated when Justice Wittner denied the

defense motion to redact the following  portions  of A.D.A. Mourges' comments from Mitchell's

May 4, 1999 videotaped statement:

     You see I think the person who did this kind of had affection for her, because
   they covered up her nakedness afterwards.  They put the coat on her, and I think that
   is a sign of -- of affection for her, because -- you know, <u>you had</u> they had <u>to leave</u>,
   because they could be caught in the apartment with this body, but at the same time

43

there's a great deal of affection for this woman, and they didn't want to leave her body like that, so that -- that explains the coat going over her, and because it's warm, and soft, and it covers her nakedness. And from what you described your relationship with her, it seems to me that -- that you did have that kind of warmth and affection towards her. That is demonstrated by covering her nakedness with a coat.

.   .   .   .

I keep going back to this picture of -- of this coat over her, and -- and I know what you know, that this lady is -- is -- is dead, but if -- what I can't stop thinking that it showed affection for her. . . . [I]t showed a sense of he did -- <u>the person who did this, and I think it was you. Okay?</u> . . . didn't want to leave her [i]ndecent. They didn't want the next person who walked in there to -- to -- to find her in all -- you know, with no clothes on all -- all bent over, and they did this out of a sense of affection for her, and out of decency.

.   .   .   .

[Y]ou know, we come in afterwards, and work backwards. Okay? . . . . And we work backwards. We work backwards, and it all leads to you saying Greg did it. . . . Greg Miller did it . But you know, there's -- <u>there's so much more that points to you than that points to him</u>.

.   .   .   .

People don't -- you know, it's -- it's not a question of what to believe. It's the -- the -- the -- it's -- it would be --it -- <u>it would fly in the face of all of evidence that we have</u>.

(Dkt. No. 9: State Br. Appx. A: Mitchell 1st Dep't Br. at 16-19.) Although refusing to redact the statements, which came in the midst of the prosecutor's questioning Mitchell, Justice Wittner provided a limiting instruction after the May 4, 1999 video statement was played for the jury. (See pages 18-19 above.)

The First Department held that:

In order to avoid a violation of the unsworn witness rule, the court should have granted defendant's request to redact from his videotaped statement certain

comments made by the prosecutor that could be viewed as expressing an opinion as to defendant's guilt.  However, we find that any error in this regard was harmless in light of the court's limiting instruction, which the jury is presumed to have followed, and the fact that the evidence against defendant was overwhelming.

People v. Mitchell, 10 A.D.3d 554, 555, 782 N.Y.S.2d 45, 46-47 (1st Dep't 2004) (citations omitted).

A.     **Legal Principles Governing "Unsworn Witness" Rule Claims**

_____ "An attorney acts as an unsworn witness when" he has "first-hand knowledge of the events presented at trial. . . .  Moreover, his role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination." United States v. Locascio, 6 F.3d 924, 933 (2d Cir. 1993), cert. denied, 511 U.S. 1070, 114 S. Ct. 1645, 1646 (1994); accord, e.g., Peakes v. Spitzer, 04 Civ. 1342, 2004 WL 1366056 at *17 (S.D.N.Y. June 16, 2004) (Peck, M.J.), report & rec. adopted, 2004 WL 1656568 (S.D.N.Y. July 23, 2004); Dickens v. Filion, 02 Civ. 3450, 2002 WL 31477701 at *12 (S.D.N.Y. Nov. 6, 2002) (Peck, M.J.), report & rec. adopted, 2003 WL 1621702 (S.D.N.Y. Mar. 28, 2003).  The unsworn witness rule "generally stands for the proposition that the prosecutor may not inject his own credibility into the trial. . . .  [T]he rule is founded upon the possible danger that the jury, impressed by the prestige of the office of the District Attorney, will accord great weight to the beliefs and opinions of the prosecutor." People v. Paperno, 54 N.Y.2d 294, 300-01, 445 N.Y.S.2d 119, 123 (1981); accord, e.g., Peakes v. Spitzer, 2004 WL 1366056 at *17;  Dickens v. Filion, 2002 WL 31477701 at *12.

Like other claims of prosecutorial misconduct, a violation of the "unsworn witness" rule results in a constitutional error "'only when the prosecutorial remarks were so prejudicial that

they rendered the trial in question fundamentally unfair.' It is not enough if the prosecutor's remarks are improper or inappropriate, for if such comments do not affect the fundamental fairness of the trial, the harmless error doctrine applies." Holmes v. Keanes, 90 Civ. 4146, 1992 WL 27123 at *5 (S.D.N.Y. Feb. 4, 1992) (quoting Garofolo v. Coomb, 804 F.2d 201, 206 (2d Cir.1986)); see also, e.g., Rivera v. Miller, 02 Civ. 6773, 2003 WL 21321805 at *17 (S.D.N.Y. June 10, 2003) ("'constitutional error occurs only when the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair'") (quoting Garofolo, 804 F.2d at 201); Morales v. Miller, 41 F. Supp. 2d 364, 378 (S.D.N.Y. 1999) (ruling that violations of the "unsworn witness" rule are subject to the harmless error doctrine on habeas review); but cf. Moses v. Senkowski, No. 01-CV- 4423, 2004 WL 1242511 at *12 (E.D.N.Y. May 28, 2004) (while a prosecutor's questions to a witness about the prosecutor's own interview of that witness were improper under New York's "unsworn witness" rule, unsworn witness claim was not cognizable on habeas review because it involved a violation of state law, not constitutional error).

The Supreme Court last year clarified that, on habeas review, courts must analyze whether a constitutional error was harmless by using the "'the substantial and injurious effect' standard set forth in Brecht [v. Abrahamson], 507 U.S. 619, 113 S. Ct. 1710 [(1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman [v. California], 386 U.S. 18, 87 S. Ct. 824 [(1967)]." Fry v. Plier, 127 S. Ct. 2321, 2328 (2007). Under the Brecht standard, "an error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'" Fry v. Plier, 127 S. Ct. at 2325 (quoting Brecht, 507 U.S. at 631, 113 S. Ct. at 1718). "In

assessing an error's likely impact on the jury, 'the Supreme Court has found the following factors to be relevant . . . (1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence.' . . . The strength of the prosecution's case, however, 'is probably the single most critical factor.'" United States v. Lombardozzi, 491 F.3d 61, 76 (2d Cir. 2007) (quoting United States v. Reifler, 446 F.3d 65, 87 (2d Cir. 2006), & Zappulla v. New York, 391 F.3d 462, 468 (2d Cir. 2004), cert. denied, 546 U.S. 957, 126 S. Ct. 472 (2005)).; see also, e.g., A. S. Goldmen, Inc. v. Phillips, 05 Civ. 4385, 2007 WL 2994453 at *4 (S.D.N.Y. Oct. 15, 2007) (in performing harmless error analysis, a court must review the entire record and consider "'the importance of the [ ] wrongly admitted testimony, and the overall strength of the prosecution's case.'  When evaluating the importance of the testimony, the court considers whether the wrongly-admitted evidence (1) influenced an issue crucial to the jury's determination; (2) was significantly referenced throughout the prosecution's arguments; and (3) 'was cumulative of other properly admitted evidence.'") (citations omitted).

    **B.**    **Application of the Standard**

        During the May 4, 1999 video statement, A.D.A. Mourges stated that:  (1) the perpetrator covered RJJ with the coat out of affection, and (2) the evidence pointed to Mitchell rather than Miller as the perpetrator.  (See pages 42-43 above.)

        The DNA and fingerprint evidence, Mitchell's admissions and Bautista's (the bodega clerk) corroborating testimony provided overwhelming evidence of Mitchell's guilt.  (See Point II above.)  Moreover, A.D.A. Mourges' comments were not particularly important to the prosecution's

case.  The motive for covering RJJ with the coat was not crucial to the jury's determination of who

killed RJJ, and the prosecution at trial did not emphasize the motive for covering RJJ with the coat.

A.D.A. Mourges did not mention in her opening statement why Mitchell placed the fur coat on RJJ.

(Tr. 402-19.)  In summation, instead of arguing  that Mitchell's motivation for draping the fur coat

over RJJ was affection, A.D.A. Mourges contended that Mitchell draped the fur coat over RJJ

because Mitchell  "got sick of looking at her."  (Tr. 1631-33.)

In addition, A.D.A. Mourges' statements about the lack of evidence against Greg

Miller could not have influenced the jury because the properly admitted testimony of Dr. Prinz and

Det. Gallipani established that neither Greg Miller's DNA nor his fingerprints were found inside

RJJ's apartment.  (See pages 15-16 above.)

Moreover, A.D.A. Mourges' comments were not made at trial; they were made in the

course of taking a videotaped statement from Mitchell before trial, and it would have been difficult

to redact them from the videotape and still have Mitchell's videotaped responses make sense.

Finally, Justice Wittner's repeated instructions to the jury cured any potential

prejudice that the statements could have caused.  Immediately after Mitchell's May 4, 1999

videotaped statement was played for the jury, Justice Wittner instructed:

> [T]o the extent this witness Detective Mooney or Ms. Mourges expressed
> their personal opinions about the guilty or non guilt of the defendant that is like wise
> not evidence.  My opinion, the lawyers' opinions, that is not evidence.  The evidence
> is what the witnesses say, the physical exhibits, the stipulations, if any, and your
> evaluation of the credibility the reliability of the evidence.  Then you apply the law
> and determine the guilt or non guilt.  I will tell you in my charge, standard charge, the
> personal opinion of the lawyers, who are advocates in front of you, is not evidence.
> The jury must decide the case on the evidence or lack of evidence.

(See page 19 above.)  During A.D.A. Mourges' redirect of Det. Mooney, Justice Wittner reiterated

to the jury that, "[y]ou will follow the law.  I told you opinions of the lawyers is not evidence.  You

will decide this case on the evidence." (Tr. 1499.)  During the final jury charge, Justice Wittner

reminded the jury that lawyers' statements or questions are not evidence, and the jury could only

consider the evidence.  (See page 19 above.)   The jury is presumed to have followed these

instructions.  See, e.g., Zafiro v. United States, 506 U.S. 534, 540-41, 113 S. Ct. 933, 939 (1993)

("'juries are presumed to follow their instructions'") (quoting Richardson v. Marsh, 481 U.S. 200,

211, 107 S. Ct. 1702, 1709 (1987)); United States v. Scala, No. 07-2544, 2008 WL 484503 at *1 (2d

Cir. Feb. 22, 2008)("We have no reason to believe that the jury was unable to, or did not, abide by

that instruction."); United States v. McClain, 377 F.3d 219, 223 (2d Cir. 2004); Kamara v. United

States, 04 Civ. 5340, 2005 WL 1337396 at *3 (S.D.N.Y. June 6, 2005); A.S. Goldmen, Inc. v.

Phillips, 05 Civ. 4385, 05 Civ. 5496, 2006 WL 1881146 at *32-33 (S.D.N.Y. July 6, 2006) (Peck,

M.J.), report & rec. adopted, 2007 WL 2994453 (S.D.N.Y. Oct. 15, 2007); Rosario v. Walsh, 05 Civ.

2684, 2006 WL 1431410 at *23 & n.45 (S.D.N.Y. May 25, 2006) (Peck, M.J.) ("The jury is

presumed to obey a court's curative instruction.") (citing cases), report & rec. adopted, 2006 WL

1880958 (S.D.N.Y. July 5, 2006).  Justice Wittner's immediate and repeated instructions to the jury

to discount any opinions of the lawyers cured any potential prejudice arising from A.D.A. Mourges'

statements.  See Mitchell v. Herbert, No. 01-CV-681, 2008 WL 342975 at *14 (W.D.N.Y. Feb. 6,

2008)(rejecting petitioner's habeas claim because, although the prosecutor's remark, which petitioner

alleged violated the "unsworn witness" rule, was "improper, the trial court at [petitioner's] trial

thereafter appropriately instructed the jury that this comment by the prosecutor was . . . 'not

testimony that you can consider.'").

49

A.D.A. Mourges' comments constitute harmless error under the <u>Fry</u> - <u>Brecht</u> standard.

Mitchell's second habeas claim should be <u>DENIED</u>.

## IV.    MITCHELL'S CLAIM THAT THE TRIAL COURT'S PRECLUSION OF RJJ'S SEXUAL HISTORY PURSUANT TO THE NEW YORK RAPE SHIELD LAW VIOLATED MITCHELL'S CONSTITUTIONAL DUE PROCESS AND CONFRONTATION RIGHTS IS PROCEDURALLY BARRED BY ADEQUATE AND INDEPENDENT STATE LAW GROUNDS

Mitchell's habeas petition claims that his  "rights to confrontation an[d] Due process were violated when the [trial court] Barred defense counsel From cross examing witness[es] and presenting Evidence concerning The Decease[d's] vigorous sexual History with other males." (Dkt. No. 4: Pet.  ¶ 13(3).)

On direct appeal, Mitchell claimed that Justice Wittner's preclusion of evidence that RJJ "had engaged in a remarkable pattern of vigorous and unorthodox sexual activity up to the time of her death with males other than" Mitchell violated Mitchell's statutory rights and his constitutional confrontation and due process rights.  (See Dkt. No. 9: State Br. Appx. A: Mitchell 1st Dep't Br. at 58-59.)  Mitchell argued that Justice Wittner should have admitted the evidence pursuant to the interest of justice and relevancy exception of the Rape Shield Law, C.P.L. § 60.42,  because the evidence corroborated Mitchell's version of events, accounted for the unidentified fingerprints in RJJ's apartment, provided a benign explanation for Mitchell's fingerprints in the apartment and offered the possibility that another man's sperm with the same Y-STR DNA profile as Mitchell may have been the source of the semen found on RJJ.  (Mitchell 1st Dep't Br. at 58-61.)  Mitchell also claimed that the evidence should have been permitted pursuant to the Rape Shield Law's fourth "source of semen" exception, C.P.L. § 60.42(4), because the evidence could have rebutted the

50

prosecution's claim that Mitchell was the source of the semen on RJJ. (Mitchell 1st Dep't Br. at 62.)

The First Department held that:

> The court properly applied the Rape Shield Law (CPL 60.42) to exclude evidence concerning the deceased's prior sexual history with men other than defendant. In the first place, the record casts doubt on whether defendant actually had any such evidence in admissible, nonhearsay form. In any event, defendant's offer of proof was based on innuendo and speculation, and the proffered evidence lacked any probative value. Accordingly, the court properly concluded that none of the statutory exceptions applied. Moreover, since DNA evidence established, and defendant admitted, that semen found on the deceased belonged to him, evidence concerning a second semen stain was speculative and irrelevant. <u>Since defendant did not assert a constitutional right to introduce any of the excluded evidence, his constitutional argument is unpreserved, and we decline to review it in the interest of justice.</u> Were we to review this claim, we would find no violation of defendant's right to present a defense. Defendant received ample scope within which to assert his claims.

<u>People</u> v. <u>Mitchell</u>, 10 A.D.3d 554, 555-56, 782 N.Y.S.2d 45, 46-47 (1st Dep't 2004) (citations

omitted & emphasis added).

The Supreme Court has made clear that the "adequate and independent state ground

doctrine applies on federal habeas," such that "an adequate and independent finding of procedural

default will bar federal habeas review of the federal claim, unless the habeas petitioner can show

cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the

federal claim will result in a fundamental miscarriage of justice." <u>Harris</u> v. <u>Reed,</u> 489 U.S. 255, 262,

109 S. Ct. 1038, 1043 (1989) (citations & internal quotations omitted).[28]

---

[28]     <u>See also</u>, <u>e.g.</u>, <u>Schlup</u> v. <u>Delo</u>, 513 U.S. 298, 314-16, 115 S. Ct. 851, 860-61 (1995); <u>Coleman</u> v. <u>Thompson</u>, 501 U.S. 722, 735, 111 S. Ct. 2546, 2557 (1991); <u>Murray</u> v. <u>Carrier</u>, 477 U.S. 478, 485-88, 496, 106 S. Ct. 2639, 2644-45, 2649-50 (1986); <u>Jones</u> v. <u>Vacco</u>, 126 F.3d 408, 415 (2d Cir. 1997); <u>Garcia</u> v. <u>Lewis</u>, 188 F.3d 71, 76-77 (2d Cir. 1999); <u>Reyes</u> v.
(continued...)

51

"[I]n order to preclude federal review [under the adequate and independent doctrine], the last state court to render judgment must 'clearly and expressly state . . . that its judgment rest[ed] on a state procedural bar.'"  Jones v. Vacco, 126 F.3d at 415 (quoting Glenn v. Bartlett, 98 F.3d at 724).  The Second Circuit has made clear that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim."  Velasquez v. Leonardo, 898 F.2d at 9; accord, e.g., Harris v. Reed, 489 U.S. at 264 n.10, 109 S. Ct. at 1044 n.10 ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding.  By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").[29/]  Thus, "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent doctrine "curtails reconsideration of the federal issue on federal habeas."  Harris v. Reed, 489 U.S. at 264 n.10, 109 S. Ct. at 1044 n.10.

Here, the First Department held that:

---

[28/]    (...continued)
Keane, 118 F.3d 136, 138-40 (2d Cir. 1997); Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996), cert. denied, 520 U.S. 1108, 117 S. Ct. 1116 (1997); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).

[29/]    See, e.g., Garcia v. Lewis, 188 F.3d at 77-82; Glenn v. Bartlett, 98 F.3d at 724-25; see also, e.g., Santiago v. People, 97 Civ. 5076, 1998 WL 803414 at *4 (S.D.N.Y. Oct. 13, 1998) ("When the state court rejects a claim both on the merits and because it was waived under the state's procedural law, review of the claim on a federal habeas corpus petition is barred.").

> Since defendant did not assert a constitutional right to introduce any of the excluded evidence [of RJJ's sexual history], his constitutional argument is unpreserved, and we decline to review it in the interest of justice. Were we to review this claim, we would find no violation of defendant's right to present a defense. Defendant received ample scope within which to assert his claims.

People v. Mitchell, 10 A.D.3d 554, 555-56, 782 N.Y.S.2d 45, 46-47 (1st Dep't 2004) (citations omitted).

State courts are not required to use any particular language:

> We encourage state courts to express plainly, in every decision potentially subject to federal review, the grounds upon which their judgments rest, but we will not impose on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim – every state appeal, every denial of state collateral review – in order that federal courts might not be bothered with reviewing state law and the record in the case.

Coleman v. Thompson, 501 U.S. at 739, 111 S. Ct. at 2559.

Furthermore, unlike the situation where the state court holds that claims were either unpreserved or without merit, which the Second Circuit has found is usually too ambiguous to preclude habeas review,[30/] here the First Department explicitly stated that it found petitioner's constitutional claim "unpreserved," and the fact that the First Department also stated the conclusion it would reach on the merits if it was to review this claim, does not change the result. See, e.g., Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 810-11 & n.4 (2d Cir. 2000) ("where a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim

---

30/ See, e.g., Galarza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001) ("We have found a state court's reliance on a state procedural bar to be ambiguous, and thus refused to invoke a procedural bar, where . . . the state court rejected defendant's claims on appeal as 'either meritless or unpreserved.'"); Tankleff v. Senkowski, 135 F.3d 235, 247 (2d Cir. 1998); Reid v. Senkowski, 961 F.2d 374, 377 (2d Cir. 1992).

53

is not preserved"); <u>Glenn</u> v. <u>Bartlett</u>, 98 F.3d at 724-25 & n.3 (state decision which denied

prosecutorial misconduct claim as not preserved for appellate review represented an independent and

adequate state procedural ground even though court addressed merits of claim "in the interests of

justice"); <u>Velasquez</u> v. <u>Leonardo</u>, 898 F.2d at 9 (state decision which denied claims as procedurally

barred but then alternatively addressed merits rested on adequate and independent state grounds).

Thus, the First Department's decision as to Mitchell's constitutional claim unambiguously rested on

a state procedural ground.[31/]

The Supreme Court has established that "the procedural bar doctrine only precludes

habeas review when the state procedural ground is firmly established and regularly followed by the

state courts." <u>Simpson</u> v. <u>Portuondo</u>, 01 Civ. 8744, 2002 WL 31045862 at *4 (S.D.N.Y. June 4,

2002) (citing <u>James</u> v. <u>Kentucky</u>, 466 U.S. 341, 348-49, 104 S. Ct. 1830, 1835 (1984)); <u>accord</u>, <u>e.g.</u>,

<u>Clark</u> v. <u>Perez</u>, 510 F.3d 382, 390 (2008).

Under New York law, "[a]s a general rule points which were not raised at trial may

not be considered for the first time on appeal." <u>People</u> v. <u>Thomas</u>, 50 N.Y.2d 467, 471, 429

N.Y.S.2d 584 (1980) (citing C.P.L. § 470.05(2)).[32/]  Moreover, a party must make a specific protest

---

[31/]    The New York Court of Appeals denied petitioner's application for leave to appeal.  (<u>See</u>
page 22 above.)  The Supreme Court held in <u>Ylst</u> v. <u>Nunnemaker</u>, 501 U.S. 797, 111 S. Ct.
2590 (1991), with respect to unexplained orders, that federal habeas courts should presume
that "[w]here there has been one reasoned state judgment rejecting a federal claim, later
unexplained orders upholding that judgment or rejecting the same claim rest upon the same
ground." <u>Id</u>. at 803, 111 S. Ct. at 2594.  Petitioner has presented no facts to rebut that
presumption here.

[32/]    C.P.L. § 470.05(2) provides, in relevant part:

(continued...)

54

at the time of a claimed error to preserve an issue for appellate review.  E.g., People v. Hardy, 4 N.Y.3d 192, 197 n.3, 791 N.Y.S.2d 513, 517 n.3 (2005).  Failure to specify the grounds for a claim of error at the time of an objection (either because an objection is general, or because it specifies a different ground than that raised on appeal) renders claims not specified unpreserved for appellate review.  E.g., Olivo v. Thorton, 05 Civ. 3237, 2005 WL 3292542 at *10 (S.D.N.Y. Dec. 6, 2005) (Peck, M.J.) ("Under New York law, a party's failure to specify the grounds for its general objection also renders its argument unpreserved for appellate review.") (citing N.Y. cases), report & rec. adopted, 2007 WL 162295 (S.D.N.Y. Dec. 6, 2007).

Here, while Mitchell opposed the prosecution's motion to preclude based on statutory grounds, he never objected to preclusion on constitutional grounds.  (See page 21 above.)

---

32/    (...continued)

For the purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same.  Such protest need not be in the form of an "exception" but is sufficient if the party made his position with respect to the ruling or instruction known to the court, or if in response to a protest by a party, the court expressly decided the question raised on appeal.  In addition, a party who without success has either expressly or impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless of whether any actual protest thereto was registered.

55

Accordingly, Mitchell's Constitutional Rape Shield exclusion habeas claim should be <u>DENIED</u> as procedurally barred by adequate and independent state law grounds.[33]

## V.    MITCHELL'S INEFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL CLAIMS SHOULD BE DENIED

### A.    The <u>Strickland</u> v. <u>Washington</u> Standard on Ineffective Assistance of Trial Counsel

In <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme Court announced a two-part test to determine if counsel's assistance was ineffective: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> at 687, 104 S. Ct. at 2064.[34] This performance is to be judged by an objective standard of reasonableness. <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 688, 104 S. Ct. at 2064.[35]

---

[33]    Because there is an adequate and independent finding by the First Department that petitioner procedurally defaulted on his claim, petitioner would have to show in his habeas petition "cause for the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u> v. <u>Thompson</u>, 501 U.S. at 750, 111 S. Ct. at 2565; <u>see also</u>, <u>e.g.</u>, <u>Schlup</u> v. <u>Delo</u>, 513 U.S. at 324-27, 115 S. Ct. at 865-67 (fundamental miscarriage of justice may be demonstrated by showing through "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial," that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence"). Petitioner does not allege cause, prejudice or a fundamental miscarriage of justice.

[34]    <u>Accord</u>, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003); <u>Bell</u> v. <u>Miller</u>, 500 F.3d 149, 156-57 (2d Cir. 2007); <u>Henry</u> v. <u>Poole</u>, 409 F.3d 48, 62-63 (2d Cir. 2005), <u>cert. denied</u>, 547 U.S. 1040, 126 S. Ct. 1622 (2006).

[35]    <u>Accord</u>, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 521, 123 S. Ct. at 2535; <u>Bell</u> v. <u>Cone</u>, 535 U.S.
(continued...)

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction . . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time . . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Strickland v. Washington, 466 U.S. at 689, 104 S. Ct. at 2065 (citation omitted).[36]

Second, the defendant must show prejudice from counsel's performance. Strickland v. Washington, 466 U.S. at 687, 104 S. Ct. at 2064. The "question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." Id. at 695, 104 S. Ct. at 2068-69. Put another way, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068.[37]

---

[35] (...continued)
685, 695, 122 S. Ct. 1843, 1850 (2002); Henry v. Poole, 409 F.3d at 63.

[36] Accord, e.g., Bell v. Cone, 535 U.S. at 698, 122 S. Ct. at 1852; Bell v. Miller, 500 F.3d at 156-57; Henry v. Poole, 409 F.3d at 63; Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001).

[37] See also, e.g., Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542; Bell v. Cone, 535 U.S. at 695, 122 S. Ct. at 1850; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert. denied, 128 S. Ct. 85 (2007); Henry v. Poole, 409 F.3d at 63-64; Aparicio v. Artuz, 269 F.3d at 95; Sellan v. Kuhlman, 261 F.3d at 315; DeLuca v. Lord, 77 F.3d 578, 584 (2d Cir.), cert. denied, 519 U.S. 824, 117 S. Ct. 83 (1996).

"[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068; accord, e.g., Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542. The phrase "reasonable probability,"
(continued...)

57

The Supreme Court has counseled that these principles "do not establish mechanical rules."  Strickland v. Washington, 466 U.S. at 696, 104 S. Ct. at  2069.  The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process.  Id.

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.'"  Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001) (quoting Strickland v. Washington, 466 U.S. at 695-96, 104 S. Ct. at 2069); accord, e.g., Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir. 1991).

---

37/     (...continued)
despite its language, should not be confused with "probable" or "more likely than not." Strickler v. Greene, 527 U.S. 263, 289-91, 119 S. Ct. 1936, 1952-53 (1999); Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565-66 (1995); Nix v. Whiteside, 475 U.S. 157, 175, 106 S. Ct. 988, 998 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under Strickland"); Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").  Rather, the phrase "reasonable probability" seems to describe a fairly low standard of probability, albeit somewhat more likely than a "reasonable possibility." Strickler v. Greene, 527 U.S. at 291, 119 S. Ct. at 1953; cf. id. at 297-301, 119 S. Ct. at 1955-58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland v. Washington, 466 U.S. at 697, 104 S. Ct. at 2069.[38]

In addition, the Supreme Court has counseled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . . In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland v. Washington, 466 U.S. at 690-91, 104 S. Ct. at 2066.[39]

---

[38]    Accord, e.g., Smith v. Robbins, 528 U.S. 259, 286 n.14, 120 S. Ct. 746, 764 n.14 (2000).

[39]    See also, e.g., Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003); Engle v. Isaac, 456 U.S. 107, 134, 102 S. Ct. 1558, 1575 (1982) ("We have long recognized . . . that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998) ("In reviewing Strickland claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on . . . counsel a duty to raise every "colorable" claim' on appeal.") (citations omitted); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), cert. denied, 513 U.S. 820, 115 S. Ct. 81 (1994).

59

As the Second Circuit noted:  "The <u>Strickland</u> standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." <u>Lindstadt</u> v. <u>Keane</u>, 239 F.3d at 199; <u>accord</u>, <u>e.g.</u>, <u>Bell</u> v. <u>Miller</u>, 500 F.3d at 156-57.

## 1.    Strickland and Appellate Counsel

The <u>Strickland</u> test applies to appellate as well as trial counsel.  <u>See</u>, <u>e.g.</u>, <u>Smith</u> v. <u>Robbins</u>, 528 U.S. 259, 285, 120 S. Ct. 746, 764 (2000).[40/]  A petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful before the state's highest court.  <u>E.g.</u>, <u>Smith</u> v. <u>Robbins</u>, 528 U.S. at 285, 120 S. Ct. at 764; <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d at 95; <u>Mayo</u> v. <u>Henderson</u>, 13 F.3d at 533-34; <u>see also</u> <u>Larrea</u> v. <u>Bennett</u>, 01 Civ. 5813, 2002 WL 1173564 at *18 n.30 (S.D.N.Y. May 31, 2002) (Peck, M.J.) (discussing the issue of whether a federal or state standard should apply), <u>report & rec. adopted</u>, 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002), <u>aff'd</u>, 368 F.3d 179 (2d Cir. 2004).

Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."

---

[40/]    <u>Accord</u>, <u>e.g.</u>, <u>Evitts</u> v. <u>Lucey</u>, 469 U.S. 387, 396-97, 105 S. Ct. 830, 836-37 (1985); <u>Frederick</u> v. <u>Warden</u>, <u>Lewisburg Corr. Facility</u>, 308 F.3d 192, 197 (2d Cir. 2002), <u>cert. denied</u>, 537 U.S. 1146, 123 S. Ct. 946 (2003); <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d 78, 95 (2d Cir. 2001); <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d 303, 319 (2d Cir. 2001); <u>McKee</u> v. <u>United States</u>, 167 F.3d 103, 106 (2d Cir. 1999); <u>Mayo</u> v. <u>Henderson</u>, 13 F.3d 528, 533 (2d Cir.), <u>cert. denied</u>, 513 U.S. 820, 115 S. Ct. 81 (1994); <u>Claudio</u> v. <u>Scully</u>, 982 F.2d 798, 803 (2d Cir. 1992), <u>cert. denied</u>, 508 U.S. 912, 113 S. Ct. 2347 (1993); <u>Abdurrahman</u> v. <u>Henderson</u>, 897 F.2d 71, 74 (2d Cir. 1990).

Smith v. Robbins, 528 U.S. at 288, 120 S. Ct. at 765 (citing Jones v. Barnes, 463 U.S. 745, 750-54, 103 S. Ct. 3308, 3312-14 (1983)).[41]  Reviewing courts should not second guess the reasonable professional judgments of appellate counsel as to the most promising appeal issues.  Lugo v. Kuhlmann, 68 F. Supp. 2d 347, 371-72 (S.D.N.Y. 1999) (Patterson, D.J. & Peck, M.J.).[42]  Thus, a petitioner may establish constitutionally inadequate performance only by showing that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  Mayo v. Henderson, 13 F.3d at 533; see also, e.g., Jackson v. Leonardo, 162 F.3d at 85.

### 2.    Strickland and the AEDPA Review Standard

For purposes of this Court's AEDPA analysis, "the Strickland standard . . . is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  Aparicio v. Artuz, 269 F.3d 78, 95 & n.8 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)).[43]  "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established.'"  Aparicio v. Artuz, 269 F.3d at 95 n.8.

---

[41]    Accord, e.g., Sellan v. Kuhlman, 261 F.3d at 317 ("This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998); Mayo v. Henderson, 13 F.3d at 533.

[42]    Accord, e.g., Jones v. Barnes, 463 U.S. at 754, 103 S. Ct. at 3314; Tsirizotakis v. LeFevre, 736 F.2d 57, 65 (2d Cir.), cert. denied, 469 U.S. 869, 105 S. Ct. 216 (1984).

[43]    See also, e.g., Wiggins v. Smith, 539 U.S. 510, 521-22, 123 S. Ct. 2527, 2535 (2003); Bell v. Cone, 535 U.S. 685, 698, 122 S. Ct. 1843, 1852 (2002); Mosby v. Senkowski, 470 F.3d 515, 518-19 (2d Cir. 2006), cert. denied, 128 S. Ct. 75 (2007); Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001).

"For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. . . . Rather, he must show that the [First Department] applied Strickland to the facts of his case in an objectively unreasonable manner."  Bell v. Cone, 535 U.S. at 698-99, 122 S. Ct. at 1852; see also, e.g., Yarborough v. Gentry, 540 U.S. 1, 5, 124 S. Ct. 1, 4 (2003); Mosby v. Senkowski, 470 F.3d at 519.

**B.     Mitchell's Ineffective Assistance of Trial Counsel Claims Should Be Denied**

Because Mitchell's habeas petition claims that his trial counsel was ineffective (Dkt. No. 4: Pet. ¶ 13(4)), without any explanation, the Court will liberally construe the petition as raising all of the ineffective assistance of trial counsel claims in Mitchell's two C.P.L. § 440.10 motions (see pages 22-24 above).[44/]

---

[44/]     Justice Wittner denied Mitchell's second C.P.L. § 440.10 motion because Mitchell "failed to provide the court with an affidavit from counsel and, in any event, his claim is without merit." (Dkt. No. 9: State Br. Appx. K: 12/13/05 Justice Wittner Order; see page 24 above.) It appears that Justice Wittner was relying on C.P.L. § 440.30(4)(b), which states that "[u]pon considering the merits of the [§ 440] motion, the court may deny it without conducting a hearing if: . . . (b) [t]he motion is based upon the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts . . . ."

While there had been a split of authority within the Circuit, this Court held that a state court's denial of a motion pursuant to C.P.L. § 440.30(4)(b) is not an "independent and adequate" state procedural bar because the state court must "'consider[] the merits'" when denying a motion pursuant to C.P.L. § 440.30. Skinner v. Duncan, 07 Civ. 6656, 2003 WL 21386032 at *27-28 (S.D.N.Y. June 17, 2003) (Peck, M.J.), report & rec. adopted, 2005 WL 1633730 (S.D.N.Y. July 11, 2005).  The Second Circuit subsequently ruled that a state court's denial
(continued...)

Mitchell argued in his first C.P.L. § 440.10 motion that trial counsel was ineffective for failing to call a DNA expert on Mitchell's behalf, introduce evidence of RJJ's sexual history and exploit the presence of blood on another suspect's pants.  (See page 22 above.)  Justice Wittner denied the motion "for reasons set forth in [the] People's response."  (See page 22 above.)

Mitchell's second C.P.L. § 440.10 motion claimed that: (1) trial "counsel fail[ed] to formulate an adequate defense or conduct any kind of meaningful investigation to try to obtain witness(es) or evidence for the defense"; (2) defense counsel told Mitchell "that she had found witnesses that were willing to testify about their first hand knowledge of the deceased's very active and extravagant sex life-style," but counsel never informed Mitchell of any details nor met with the prosecutor to review the information; (3) "[d]efense counsel failed to investigate Greg Miller" and failed to explain the "cause for the blood that was on Greg Miller's sweat-pant[s]"; (4) "[d]efense counsel failed to call expert witness with information that totally contradicted the testimony of the State expert witness . . . [and showed] the critical mistakes that the State's lab technicians made doing their testings"; (5) "[d]efense counsel fail[ed] to obtain Brady material from the [P]eople (bloody sandal [sic; saddle] wood)"; (6) "[d]efense counsel fail[ed] to disclose to the Court a potential witness list for the defense . . . [which] left [Mitchell] without any-kind of defense"; and

---

44/     (...continued)
of a motion pursuant to C.P.L. § 440.30(4)(c) is a "judgment on the merits" and not an independent and adequate state procedural bar.  Garcia v. Portundo, 104 Fed. Appx. 776, 779 (2d Cir. 2004) ("Even aside from the fact that [C.P.L. § 440.30(4)] opens with an explicit reference to 'considering the merits of the motion,' subsection (c) implicitly requires a balancing of the evidence presented by the parties. . . .").  Accordingly, this Court will address the merits of Mitchell's ineffective assistance of trial counsel claims.

63

(7) "[d]efense counsel failed to raise a repugnant verdict issue after the jury's verdict was read." (See page 23 above.)  Justice Wittner, citing the prosecutor's opposition, denied the motion because "[d]efendant has failed to provide the court with an affidavit from counsel and, in any event, his claim is without merit."  (See page 24 above.)

> **1.      Trial Counsel's Failure to Call A DNA Expert Witness To Testify Was A Reasonable Strategic Decision and Did Not Constitute Deficient Performance**

Mitchell's first and second C.P.L. § 440 motions claimed that trial counsel was ineffective for failure to call a DNA expert to rebut Dr. Prinz' testimony.

Courts in this Circuit have made clear that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir.), cert. denied, 484 U.S. 958, 108 S. Ct. 357 (1987); see, e.g., United States v. DeJesus, 57 Fed. Appx. 474, 478 (2d Cir.) ("A trial counsel's 'decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.' Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed."  Counsel's decision not to call a particular witness was grounded in strategy and not deficient, "even though [defendant] requested that she do so and provided her with contact information for potential witnesses.") (citation omitted), cert. denied, 538 U.S. 1047, 123 S. Ct. 2110 (2003).[45]

---

[45]      See also, e.g., United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002) ("A failure to call
(continued...)

Moreover, "[t]he decision whether to call an expert witness at trial generally falls within the realm of strategic choices that should not be second-guessed by a court on review." Rayford v. Greene, No. 02-CV-0811, 2008 WL 941706 at *8 (W.D.N.Y. Apr. 4, 2008) (citing United States v. Kirsh, 54 F.3d 1062, 1072 (2d Cir. 1995)); accord, e.g., Savinon v. Mazucca, 04 Civ. 1589, 2005 WL 2548032 at *33 (S.D.N.Y. Oct. 12, 2005) (citing cases), report & rec. adopted, 2005 WL 2548032 (S.D.N.Y. Sept. 18, 2006); Stapleton v. Greiner, No. 98 CV 1971, 2000 WL

---

45/    (...continued)
a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."), cert. denied, 538 U.S. 1021, 123 S. Ct. 1949 (2003); United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998), cert. denied, 526 U.S. 1164, 119 S. Ct. 2059 (1999); United States v. Schmidt, 105 F.3d 82, 90 (2d Cir.) ("[T]he tactical decision of whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation."), cert. denied, 522 U.S. 846, 118 S. Ct. 130 (1997); Lawson v. Caspari, 963 F.2d 1094, 1096 (8th Cir. 1992) (Counsel was not ineffective for failing to call alibi witnesses he did not believe were credible, especially where counsel "presented a theory of the case by pointing out the 'weaknesses in the state's case and rais[ing] serious questions about the credibility of the state's sole eyewitness.'"); Reid v. Giambruno, No. 03-CV-0240, 2007 WL 3232497 at *11 (W.D.N.Y. Oct. 31, 2007); Harris v. Hollins, 95 Civ. 4376, 1997 WL 633440 at *6 (S.D.N.Y. Oct. 14, 1997) (counsel not ineffective for not securing alibi witnesses where counsel presented a vigorous defense); Jones v. Hollins, 884 F. Supp. 758, 765-66 (W.D.N.Y. 1995) ("Generally, the decision whether to pursue a particular defense is a tactical choice which does not rise to [the] level of a constitutional violation. . . .   [T]he habeas court 'will not second-guess trial strategy simply because the chosen strategy has failed . . . ,' especially where the petitioner has failed to identify any specific evidence or testimony that would have helped his case if presented at trial.") (citations omitted), aff'd, No. 95-2279, 89 F.3d 826 (table), 1995 WL 722215 (2d Cir. Nov. 30, 1995); Lou v. Mantello, No. 98-CV-5542, 2001 WL 1152817 at *10 (E.D.N.Y. Sept. 25, 2001) ("Habeas claims based on 'complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified [to] are largely speculative.'") (quoting Ruzas v. Sullivan, 85 Civ. 4801, 1988 WL 83377 at *14 (S.D.N.Y. Aug. 2, 1988)); Rodriguez v. Mitchell, 92 Civ. 2083, 1993 WL 229013 at *3, 5 (S.D.N.Y. June 24, 1993) ("Counsel's decision not to call a witness, if supported by valid tactical considerations, does not constitute ineffective assistance of counsel.").

1207259 at *16 (E.D.N.Y. July 10, 2000) (Raggi, D.J.).  This is especially so where petitioner "'has only presented his vague hope that another expert might have reached a different result than the government expert.'"  Savinon v. Mazucca, 2005 WL 2548032 at *33.

Nevertheless, "'[i]n some instances, the failure to call an expert witness may satisfy the two-pronged ineffective assistance of counsel standard.' However, '[w]here an expert would only marginally assist the jury in its role as fact finder, an attorney's decision not to call an expert is more likely to fall within the bounds of reasonable performance and less likely to prejudice the defendant.'"  Massaro v. United States, 97 Civ. 2971, 2004 WL 2251679 at *4 (S.D.N.Y. Oct. 5, 2004), aff'd, 152 Fed. Appx. 20 (2d Cir. 2005); see also Stapleton v. Greiner, 2000 WL 1207259 at *16 ("[I]n some circumstances, an attorney's failure to arrange for an independent expert examination of critical evidence may be so objectively unreasonable as to violate the Sixth Amendment.").

Mitchell's counsel's strategy not to call a DNA expert was a reasonable strategic choice.  Defense counsel employed Dr. Lawrence Kobilinsky to scrutinize the prosecution's DNA results in this case.  (See page 22 above.)  Compare, e.g., Gersten v. Senkowski, 426 F.3d 588, 607-11 (2d Cir. 2005) ("[W]e judge the reasonableness of the purported 'strategic decision' on the part of defense counsel 'in terms of the adequacy of the investigations supporting' it," and finding counsel ineffective for failing to consult medical and psychiatric experts or conduct an investigation, despite the problems with the prosecution expert's testimony.), cert. denied, 547 U.S. 1191, 126 S. Ct. 2882 (2006).  That Mitchell's defense counsel hired, but declined at trial to call Dr. Kobilinsky suggests either that Dr. Kobilinsky's testimony would not have rebutted Dr. Prinz's testimony or that counsel was sufficiently able to show through cross-examining Dr. Prinz that the Y-STR and THO-1 tests

did not conclusively prove that Mitchell was the source of the semen on RJJ's coat. Mitchell has failed to offer any contrary explanation for counsel's decision not to have Dr. Kobilinsky testify. See Savinon v. Mazucca, 2005 WL 2548032 at *33 ("The decision of trial counsel not to call an expert 'cannot be considered objectively unreasonable,'" given that petitioner has not provided an "affidavit or other basis on which to conclude that there existed a witness who could have offered relevant and probative evidence contrary to the testimony offered" by the prosecution's expert witness.); Stapleton v. Greiner, 2000 WL 1207259 at *14 (counsel not ineffective for failure to call an expert to authenticate potential evidence because petitioner came "forward with no affidavits or other admissible evidence indicating that any expert witness could have identified the voices or handwriting as [petitioner] proposes. Absent such evidence it is difficult to imagine any prejudice.").

Defense counsel, who appeared well-versed in DNA testing, exploited the weaknesses in the government's DNA evidence by extensively cross-examining Dr. Prinz. Defense counsel elicited testimony from Dr. Prinz emphasizing that, although sperm was found on the anal and oral swabs, both swabs tested negative for DNA. (See pages 15-16 above; Prinz: Tr. 1312-15.) Defense counsel also established on cross-examination of Dr. Prinz that one semen stain on the fur coat did not yield DNA results. (Prinz: Tr. 1332.) Counsel also elicited from Dr. Prinz that dry semen stains, such as the one on the fur coat, may be stable for many years, supporting the defense theory that the stain may have been from RJJ and Mitchell's past sexual encounters. (See page 16 n.8 above; Prinz: Tr. 1327.) Counsel also established that the Y-STR and THO-1 tests "cannot include someone to 100 percent certainty" and emphasized that the sample here only included 128 black males, despite Dr. Prinz's conclusion that one in 660 black males would have the same THO-1 and Y-STR profile

as Mitchell.  (See page 16 & n.10 above; Prinz: Tr. 1335-37.)  Additionally, counsel elicited testimony from Dr. Prinz that the first DNA test of the fur coat stain, which produced the matching DNA results in the second test, did not produce conclusive DNA results, and the third test showed, in addition to a match for Mitchell's DNA, an extract from an unknown male that was not on the sample originally.  (See page 16 & n.9 above; Prinz: Tr. 1333-34.)

Even if Mitchell had established the first Strickland prong – which he has not – Mitchell still is unable to satisfy the second, prejudice Strickland prong because Mitchell admitted having had sex with RJJ on the day that he broke into her apartment, making the DNA evidence cumulative, and the evidence against Mitchell was overwhelming (see Point II above).  See, e.g., Velazquez v. Poole, No. 04-CV-0478, 2007 WL 3240550 at *38 (E.D.N.Y. Oct. 30, 2007) (Petitioner could not have suffered prejudice from counsel's failure to hire a DNA expert because petitioner himself had informed the prosecution about a t-shirt containing petitioner's semen which matched DNA found on the victim, and the evidence against petitioner was overwhelming.).

Accordingly, since Mitchell cannot demonstrate that trial counsel's failure to call a rebuttal DNA expert was an unreasonable strategic decision or that Mitchell was prejudiced by counsel's decision, Mitchell's DNA expert ineffective assistance habeas claim should be DENIED.

**2.     Trial Counsel Was Not Ineffective for Failing to Introduce Evidence of RJJ's Sexual History**

Mitchell claimed in his two C.P.L. § 440.10 motions that trial counsel provided ineffective assistance for:  (1) failing to disclose to Mitchell and the prosecution the witnesses who

could testify to RJJ's sexual history;[46/] (2) failing to produce a potential witness list for the trial court; and (3) failing to call witnesses to testify to RJJ's sexual history.  (See pages 22-23 above.)

Justice Wittner, however, correctly precluded defense counsel from introducing evidence of RJJ's past sexual history pursuant to New York's Rape Shield Law.  (See pages 5-7, Point IV above.)  Therefore, counsel's representation was not ineffective for being unable to introduce evidence that counsel tried to introduce but that Justice Wittner properly excluded.  See, e.g., Jones v. Greene, 05 Civ. 8997, 2007 WL 2089291 at *9 (S.D.N.Y. July 20, 2007) (Counsel's failure to introduce evidence was not ineffective where counsel attempted to admit the evidence and the court properly precluded it.); Bennett v. Spitzer, No. 05-CV-1399, 2007 WL 389213 at *8 (E.D.N.Y. Jan. 31, 2007) (Counsel was not ineffective for failing to offer police reports that contained inadmissible hearsay.).

---

[46/]    Mitchell's final habeas claim asserts that the "[f]ailure to disclose [a] video cassette of [a] witness who names another man as the killer."  (Dkt. No. 4: Pet. ¶ 13(6).)  Mitchell's second C.P.L. § 440 motion and Mitchell's coram nobis petition claimed that trial counsel was ineffective for failing to produce to the prosecutor and Mitchell a video cassette of a witness testifying to the "deceased['s] very active and extravagant sexual life-style."  (See pages 23, 24 above.)  Presumably, Mitchell's final claim refers to the same video cassette, in which a witness allegedly stated that RJJ answered her door naked and had sex with a butcher's delivery man. (See pages 5-6 above.)  Nothing in the record suggests that any video cassette showed a witness accusing someone other than Mitchell of killing RJJ.  The Court will treat Mitchell's final claim as part of Mitchell's claim that trial counsel was ineffective for failing to introduce evidence of RJJ's sexual history.

To the extent that this Court has misinterpreted Mitchell's claim, any new claim about a different video tape is unexhausted, but deemed exhausted and procedurally barred, because Mitchell failed to raise the claim in his direct appeal, C.P.L. § 440 motions or coram nobis application.  See, e.g., Washington v. James, 996 F.2d 1442, 1446-47 (2d Cir. 1993), cert. denied, 510 U.S. 1078, 114 S. Ct. 895 (1994); Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997).

Mitchell's ineffective assistance claim based on alleged failure to introduce evidence about RJJ's sexual history should be <u>DENIED</u>.

### 3.    Trial Counsel Was Not Ineffective for Failing to Investigate the Blood on Greg Miller's Sweatpants

Mitchell's C.P.L. § 440.10 motions argued that counsel was ineffective for failing to investigate why Greg Miller's blood was on Greg Miller's sweatpants that Dr. Prinz tested. (<u>See</u> pages 22-23 above.)

The Supreme Court stated that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668, 691, 104 S. Ct. 2052, 2066 (1984). Where there is no reason to investigate further, counsel is not ineffective for failing to further investigate:

> Although in some cases a reasonable investigation will require defense counsel to "speak before trial with readily-available fact witnesses whose non-cumulative testimony would directly corroborate the defense's theory of important disputes," <u>Pavel</u> v. <u>Hollins</u>, 261 F.3d 210, 221 (2d Cir.2001), a decision not to pursue an investigation may not be challenged as unreasonable "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless." <u>Strickland</u>, 466 U.S. at 691. In other words, the duty to investigate "does not . . . compel defense counsel to investigate comprehensively every lead or possible defense . . . or 'to scour the globe on the off-chance something will turn up.'" <u>Greiner</u> v. <u>Wells</u>, 417 F.3d 305, 321 (2d Cir. 2005) (quoting <u>Rompilla</u> v. <u>Beard</u>, 545 U.S. 374, 383, 125 S. Ct. 2456 (2005)). To the extent that counsel determines that additional investigation "would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." <u>Id</u>. at 321 (quoting <u>Strickland</u>, 466 U.S. at 691).

<u>Cheng Kang Shi</u> v. <u>Connolly</u>, No. 06-CV-2093, 2007 WL 4380276 at *20 (E.D.N.Y. Dec. 13, 2007).

Mitchell's counsel's decision to forego investigating the causes of the blood on Miller's sweat pants was a reasonable strategic decision. Such investigation would have been fruitless – the blood on Greg Miller's sweatpants belonged to Miller, "signif[ying] nothing, " and the fingerprint and DNA evidence excluded Miller as the perpetrator. (See pages 15-16, 22 above.) See, e.g., Burger v. Kemp, 483 U.S. 776, 794-95, 107 S. Ct. 3114, 3126 (1987); Perkins v. Comm'r of Corr. Servs., 218 Fed. Appx. 24, 26 (2d Cir. 2007) ("Perkins challenges as ineffective assistance of counsel his . . . counsel's alleged failure to explore the testimony of additional potential witnesses. Trial counsel's affidavit adequately . . . establishes that the other alleged witnesses were not actual witnesses to the crime. Counsel's decisions, seen in the context of his vigorous attack on the reliability of the identification of Perkins by the only eyewitness, fall within 'the wide range of professionally competent assistance.'"); Brown v. Miller, 185 Fed. Appx. 25, 27 (2d Cir. 2006), cert. denied, 127 S. Ct. 938 (2007); Greiner v. Wells, 417 F.3d 305, 321 (2d Cir. 2005) ("But, as a general matter, when there is 'reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.'" Moreover, . . . petitioner's "'failure-to-investigate' argument is identical to and no greater than his 'failure-to-introduce evidence' argument . . . [i]t is not a complaint about the scope of [counsel's] investigation but, rather, a complaint about trial strategy cast in investigatory terms."), cert. denied, 546 U.S. 1184, 126 S. Ct. 1363 (2006); United States v. Hyman, 128 Fed. Appx. 195, 198 (2d Cir. 2005); Robinson v. Senkowski, 100 Fed. Appx. 10, 11 (2d Cir. 2004) (Counsel was not ineffective for "failing to investigate two potential alibi witnesses" because "[t]he alibi that would have been offered by the two potential witnesses contradicted the alibi offered at trial. Therefore,

it was a legitimate trial strategy not to investigate or present witnesses who would have provided defendant with an alternative alibi."); <u>Ryan</u> v. <u>Rivera</u>, 21 Fed. Appx. 33, 35 (2d Cir. 2001) (Counsel was not ineffective for "not interviewing the proposed witnesses" where defendant "obtain[ed] statements from the witnesses which, together with what [petitioner] had told [counsel] and the police reports obtained by discovery, provided counsel with sufficient information to conclude, as he apparently did, that the alibi witnesses were not credible or that their testimony would harm [petitioner] more than it would help him."); <u>Cheng Kang Shi</u> v. <u>Connolly</u>, 2007 WL 4380276 at *20 (rejecting petitioner's claim that counsel was ineffective for failing to investigate two possible eyewitnesses where counsel "could reasonably have concluded that such an investigation would have been fruitless and indeed a waste of valuable time and resources"); <u>United States</u> v. <u>Romero</u>, 91 Cr. 586, 1993 WL 485677 at *7-8 (S.D.N.Y. Nov. 22, 1993) (An attorney is under no obligation to investigate every line of defense a defendant suggests, and, instead, "an attorney is required only to make a reasonable decision about whether to investigate a particular line of defense based upon the overall defense strategy." Counsel was not ineffective for not interviewing two eyewitnesses because their testimony "would not be helpful to his planned defense" and for not interviewing alibi witnesses since "he believed it would be fruitless to pursue such testimony, since it could not conclusively establish" the defendant's alibi.), <u>aff'd</u>, 54 F.3d 56 (2d Cir.1995), <u>cert. denied</u>, 517 U.S. 1149, 116 S. Ct. 1449 (1996)).[47]

---

[47]    <u>See also</u>, <u>e.g.</u>, <u>Halo</u> v. <u>United States</u>, No. 06-CV-5041, 2007 WL 1299158 at *13 (E.D.N.Y. Apr. 30, 2007) ("[T]he duty to investigate does not . . . compel defense counsel to investigate comprehensively every lead or possible defense . . . or to scour the globe on the off-chance (continued...)

Mitchell's failure to investigate Miller's blood ineffective assistance claim should be

DENIED.

### 4. Trial Counsel's Failure to Claim a <u>Brady</u> Violation Based on the Prosecution's Failure to Retrieve and Test The Wooden Door Saddle When It Was Discovered At the Scene Did Not Constitute Deficient Performance

Mitchell's second C.P.L. § 440 motion claimed that trial counsel was ineffective for

failing to "request a mistrial & dismissal of charges for the State[']s failure to disclose <u>Brady</u> and

<u>Rosario</u> material (bloody sandal wood)."[48/]   (<u>See</u> page 23 above.)   Mitchell argued that the

---

[47/]   (...continued)
something will turn up.") (quotations omitted); <u>United States</u> v. <u>Morris</u>, No. CRIM. 3:02ER53, 2005 WL 80881 at *5 (D. Conn. Jan. 12, 2005) ("A lawyer has no duty to undertake a wild-goose chase to uncover evidence that might support a palpably incredible defense proposed by her client.  It is even conceivable that undertaking such an investigation might harm a client, by wasting time and resources that could better be devoted to the pursuit of more reasonable claims."); <u>Johnson</u> v. <u>United States</u>, 307 F. Supp. 2d 380, 391-92 (D. Conn. 2003) ("Petitioner alleges that his trial counsel was ineffective for failing to use proper investigative procedures to locate two potential witnesses.  Johnson now claims these witnesses could have testified against the government's contention that Johnson had employed them to drive Rivera to deliver heroin.  Petitioner acknowledges that his trial counsel attempted to subpoena these two individuals, but was unsuccessful as they had moved out of town.  He now alleges his counsel should have made a more diligent effort to find these witnesses. . . . [T]his court finds that it was reasonable for Johnson's trial counsel to decide not to pursue these witnesses further.  Johnson provides no reason for the court to believe these witnesses would have exonerated him.  In contrast, there is a distinct possibility that the witnesses may have further inculpated the petitioner. "); <u>Chacko</u> v. <u>United States</u>, 96 Cr. 519 & 00 Civ. 405, 2000 WL 1808662 at *7 (S.D.N.Y. Dec. 11, 2000) ("The petitioner alleges that his trial counsel was inadequately prepared and failed to investigate his claim. . . . [E]ach of these witnesses could have given testimony that was harmful to the defendant.  The decision to put on witnesses is a strategic decision within the discretion of trial counsel.").

[48/]   The "bloody sandal wood" Mitchell refers to was the wooden door saddle.  (<u>See</u> Dkt. No. 9: State Br. Appx. J: State Response to Mitchell 2d C.P.L. § 440 Mot. ¶ 8.)

prosecution committed a <u>Brady</u> violation because the police originally failed to recover, and conduct a timely test of, the bloody wooden door saddle from RJJ's apartment.  (Dkt. No. 9: State Br. Appx. I: Mitchell 2d C.P.L. § 440 Mot. at 18-19.)   The police waited two years before recovering and testing the saddle and "[b]y then, [the] evidence had become contaminated and useless to both [the] State and the defense."  (Mitchell 2d C.P.L. § 440 Mot. at 19.)

### a.     The Brady v. Maryland Standard

Under <u>Brady</u> v. <u>Maryland</u> and its progeny, state as well as federal prosecutors must turn over exculpatory and impeachment evidence, whether or not requested by the defense, where the evidence is material either to guilt or to punishment.  <u>See</u>, <u>e.g.</u>, <u>Strickler</u> v. <u>Greene</u>, 527 U.S. 263, 280, 119 S. Ct. 1936, 1948 (1999); <u>United States</u> v. <u>Bagley</u>, 473 U.S. 667, 676, 682, 105 S. Ct. 3375, 3380, 3383-84 (1985); <u>United States</u> v. <u>Agurs</u>, 427 U.S. 97, 107, 96 S. Ct. 2392, 2399 (1976); <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963).[49/]   The <u>Brady</u> rule also encompasses evidence known only to the police:  "In order to comply with <u>Brady</u>, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'"  <u>Strickler</u> v. <u>Greene</u>, 527 U.S. at 281, 119 S. Ct. at 1948 (quoting <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 437, 115 S. Ct. 1555, 1567 (1995)).

---

[49/]     <u>See also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Jackson</u>, 345 F.3d 59, 70 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 956, 124 S. Ct. 1705 (2004); <u>Shabazz</u> v. <u>Artuz</u>, 336 F.3d 154, 161-62 (2d Cir. 2003); <u>United States</u> v. <u>Gil</u>, 297 F.3d 93, 101, 103 (2d Cir. 2002); <u>United States</u> v. <u>Coppa</u>, 267 F.3d 132, 135, 139 (2d Cir. 2001); <u>United States</u> v. <u>Diaz</u>, 176 F.3d 52, 108 (2d Cir.), <u>cert. denied</u>, 528 U.S. 875, 120 S. Ct. 181 (1999); <u>Tankleff</u> v. <u>Senkowski</u>, 135 F.3d 235, 250 (2d Cir. 1998); <u>Orena</u> v. <u>United States</u>, 956 F. Supp. 1071, 1090-92 (E.D.N.Y. 1997) (Weinstein, D.J.).

The Brady rule does not require a prosecutor to "deliver his entire file to defense counsel," but only to disclose those items which are material to the defendant's guilt or punishment. United States v. Bagley, 473 U.S. at 675, 105 S. Ct. at 3380; accord, e.g., Kyles v. Whitley, 514 U.S. at 437, 115 S. Ct. at 1567 ("We have never held that the Constitution demands an open file policy."); United States v. Agurs, 427 U.S. at 108-09, 96 S. Ct. at 2400.[50]

"There are three components of a true Brady violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Strickler v. Greene, 527 U.S. at 281-82, 119 S. Ct. at 1948.[51]

---

[50] See also, e.g., United States v. Coppa, 267 F.3d at 135; Tate v. Wood, 963 F.2d 20, 25 (2d Cir. 1992); United States v. Gaggi, 811 F.2d 47, 59 (2d Cir.), cert. denied, 482 U.S. 929, 107 S. Ct. 3214 (1987); Hoover v. Leonardo, No. 91-CV-1211, 1996 WL 1088204 at *2 (E.D.N.Y. June 11, 1996).

[51] See also, e.g., Banks v. Dretke, 540 U.S. 668, 691, 124 S. Ct. 1256, 1272 (2004); Moore v. Illinois, 408 U.S. 786, 794-95, 92 S. Ct. 2562, 2568 (1972); United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004); United States v. Jackson, 345 F.3d at 71; United States v. Gil, 297 F.3d at 101; United States v. Coppa, 267 F.3d at 140; United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995), cert. denied, 516 U.S. 1165, 116 S. Ct. 1056 (1996); Orena v. United States, 956 F. Supp. at 1090.

75

### b.    Application of the Brady Standard to Mitchell's Claim[52]

Mitchell has not satisfied the first Brady prong because he has failed to show that, even if the bloody wooden door saddle had been recovered and tested initially, the evidence from the saddle would have been "favorable" to Mitchell.  See, e.g., Leake v. Senkowski, 01 Civ.7559, 2004 WL 1464889 at *24-25 (S.D.N.Y. June 30, 2004) (Police failure to collect and test blood samples from bloody stains on the sidewalk and test a bloody sweatshirt did not constitute a Brady violation because petitioner failed to "demonstrate either that the blood evidence, if preserved and tested, would have been 'favorable to' him or that prejudice resulted from the failure to preserve and test it.").  In fact, Det. Rodriguez and Dr. Prial did not recover the door saddle initially because they concluded that the blood on the saddle was RJJ's based on RJJ's "blunt-impact" facial  injuries and the type of blood spatter around the saddle.  (See page 10 above.)[53]

Mitchell's ineffective assistance of counsel claim relating to the bloody wooden door saddle should be DENIED.

---

[52]    Although Mitchell claims that the prosecution committed both a Brady and Rosario violation by failing to timely recover and test the wooden door saddle, this Court only will discuss Mitchell's Brady claim because Rosario is a state law matter and, in any event, deals with recorded statements by individuals, not physical evidence.  See People v. Rosario, 9 N.Y.2d 286, 213 N.Y.S.2d 448, cert. denied, 368 U.S. 866, 82 S. Ct. 117 (1961), codified as C.P.L. § 240.45.

[53]    Mitchell also has not satisfied the second Brady prong because he failed to show that the prosecution "suppressed" evidence about the bloody door saddle.  Defense counsel extensively cross-examined Det. Rodriguez and Dr. Prial about the failure to recover and test the saddle and cross-examined Dr. Prinz about the recovery and testing of the saddle a year later.  (See page 10 above; Prinz: Tr. 1015, 1022-23, 1026.)

**5.      Trial Counsel Was Not Ineffective for Failing to Argue that the Verdict Was Repugnant**

Mitchell's second C.P.L. § 440 motion claimed that counsel was ineffective for failing to raise "a repugnant verdict issue after the jury's verdict was read." (Dkt. No. 9: State Br. Appx. I: Mitchell 2d C.P.L. § 440 Mot. ¶ 17.)  Mitchell claimed that the verdict was repugnant because he was convicted of "raping the decease[d] while committing the act of murder and sodomizing her while in the act of committing murder but, not guilty of having oral sex with her while in the act of committing murder."  (Mitchell 2d C.P.L. § 440 Mot. at 19.)

In People v. Tucker, 55 N.Y.2d 1, 447 N.Y.S.2d 132 (1981), the New York Court of Appeals stated New York's rule regarding repugnant jury verdicts:

> When there is a claim that repugnant jury verdicts have been rendered in response to a multiple-count indictment, a verdict as to a particular count shall be set aside only when it is inherently inconsistent when viewed in light of the elements of each crime as charged to the jury. . . .
>
> The critical concern is that an individual not be convicted for a crime on which the jury has actually found that the defendant did not commit an essential element, whether it be one element or all.  Allowing such a verdict to stand is not merely inconsistent with justice, but is repugnant to it. . . .
>
> The instructions to the jury will be examined only to determine whether the jury, as instructed, must have reached an inherently self-contradictory verdict.

Id. at 4, 6, 7, 447 N.Y.S.2d at 132-35; accord, e.g., Jenkins v. Unger, No. 03-CV-1172, 2007 WL 911889 at *8 (N.D.N.Y. Mar. 22, 2007); Dukes v. McGinnis, 99 Civ. 9731, 2000 WL 382059 at *12-13 (S.D.N.Y. Apr. 17, 2000) (Peck, M.J.); People v. Rayam, 94 N.Y.2d 557, 561, 708 N.Y.S.2d 37, 40 (2000); People v. Trappier, 87 N.Y.2d 55, 58, 637 N.Y.S.2d 352, 354 (1995) ("A verdict is inconsistent or repugnant . . . where the defendant is convicted of an offense containing an essential

element that the jury has found the defendant did not commit. In order to determine whether the jury reached 'an inherently self-contradictory verdict' a court must examine the essential elements of each count as charged.").

The jury convicted Mitchell of four counts of first degree murder (intentional murder committed in the course of a rape, anal sodomy, burglary and robbery), but acquitted Mitchell of the final count of first degree murder, intentional murder in the course of an oral sodomy. (See page 20 above.) Acquittal of Mitchell of intentional murder in the course of an oral sodomy does not negate an essential element of the other four convictions. Rather, the jury may have found beyond a reasonable doubt that Mitchell murdered RJJ while committing rape, anal sodomy, burglary and robbery, but found that the evidence did not prove beyond a reasonable doubt that Mitchell orally sodomized RJJ. Unlike the overwhelming proof of rape, anal sodomy, burglary and robbery, the evidence of oral sodomy was weak, consisting of just one sperm cell which could not be tested for DNA evidence. (Prinz: Tr. 1290-92, 1295-96, 1314-18.) Thus, the jury's decision to convict on four of the first degree murder counts and acquit on the oral sodomy first degree murder count did not constitute a repugnant verdict. See People v. Morris, 224 A.D.2d 450, 451, 638 N.Y.S.2d 331, 331 (2d Dep't 1996) ("Contrary to the defendant's contention, the acquittal on certain counts does not require that the guilty verdict be set aside on grounds of legal or factual insufficiency. The jury could have believed that while the charges of anal sodomy were proven beyond a reasonable doubt, the rape and oral sodomy charges were not."); People v. Barfield, 138 A.D.2d 497, 498, 525 N.Y.S.2d 892, 893 (2d Dep't 1988) (verdict was not repugnant where defendant was acquitted of first degree

rape and first degree sexual abuse, but convicted of first degree sodomy because the "elements of the crimes, as charged, are not identical").

Since the verdicts were not repugnant, the failure of trial counsel to raise a repugnant verdict objection at trial did not prejudice Mitchell, and under Strickland, Mitchell's trial counsel was not ineffective.[54]

---

[54]    To the extent Mitchell directly raises a repugnant verdict claim, that claim is not cognizable on habeas review.   It is well settled that "inconsistent jury verdicts are not a ground for habeas relief." Estrada v. Senkowski, 98 Civ. 7796, 1999 WL 1051107 at *13-14 (S.D.N.Y. Nov. 19, 1999) (citing cases); accord, e.g., Brown v. Perlman, 07 Civ. 8672, 2008 WL 2009220 at *34 & n.68 (S.D.N.Y. May 8, 2008) (Peck, M.J.); Wilson v. Senkowski, 02 Civ. 0231, 2003 WL 21031975 at *12 & n.20 (S.D.N.Y. May 7, 2003) (Peck, M.J.); Hediam v. Miller, 02 Civ. 1419, 2002 WL 31867722 at *10 (S.D.N.Y. Dec. 23, 2002); see, e.g., United States v. Powell, 469 U.S. 57, 58, 64-65, 105 S. Ct. 471, 473, 476 (1984) ("where truly inconsistent verdicts have been reached, '[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.' . . . It is equally possible that the jury, convinced of guilt, properly reached its conclusion . . . then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the [other] offense."); Harris v. Rivera, 454 U.S. 339, 345, 102 S. Ct. 460, 464 (1981) ("[i]nconsistency in a verdict is not a sufficient reason for setting it aside"); Dunn v. United States, 284 U.S. 390, 393-94, 52 S. Ct. 189, 190-91 (1932); United States v. Acosta, 17 F.3d 538, 545 (2d Cir. 1994) ("it has long been established that inconsistency in jury verdicts of guilty on some counts and not guilty on others is not a ground for reversal of the verdicts of guilty"); United States v. Alvarado, 882 F.2d 645, 653 (2d Cir. 1989), cert. denied, 493 U.S. 1071, 110 S. Ct. 1114 (1990); United States v. Romano, 879 F.2d 1056, 1060 (2d Cir. 1989); United States v. Chang An-Lo, 851 F.2d 547, 559-60 (2d Cir.), cert. denied, 488 U.S. 966, 109 S. Ct. 493 (1988); Williams v. Artuz, 98 Civ. 7964, 2002 WL 989529 at *8 (S.D.N.Y. May 15, 2002) ("A claim of inconsistent or repugnant verdicts presents no issue upon which federal habeas corpus relief could be granted."); Torres v. Costello, No. 97-CV-5480, 2001 WL 811924 at *11 (E.D.N.Y. June 1, 2001) (Raggi, D.J.) ("The Supreme Court . . . has long held that a prisoner found guilty on one count of an indictment cannot attack his conviction simply because it appears inconsistent with a finding of not guilty on another count. . . . Indeed, courts recognize that inconsistent verdicts are often a product of jury lenity, which courts will not review."); Bowden v. Keane, 85 F. Supp. 2d 246, 251 n.6 (S.D.N.Y. 2000)
(continued...)

79

### C.    Mitchell's Ineffective Assistance of Appellate Counsel Claims Should Be Denied

While Mitchell claims, without explanation, that his appellate counsel was ineffective (Dkt. No. 4: Pet. ¶ 13(5)), to liberally construe the claim, the Court will review the ineffective appellate counsel claims in Mitchell's application for a writ of error coram nobis (see page 24 above).

Mitchell's coram nobis application alleged that his appellate counsel was ineffective for failing to argue that: (1) trial counsel was ineffective for "failure to conduct her own pretrial investigation to obtain witnesses and evidence, counsel's failure to call D.N.A. expert witnesses, counsel's failure to provide a potential witness list, counsel's failure to provide a video cassette of a witness, [and] counsel relied only on the information she received"; (2) the prosecution failed to timely disclose Brady and Rosario material; (3) the trial judge's statement during the Huntley hearing about trial counsel's performance "prejudiced" Mitchell and deprived Mitchell of his "rights to a fair trial and due process"; and (4) Mitchell was unconstitutionally sentenced as a persistent felon. (See page 24 above.)

---

54/    (...continued)
("'a jury is free to render inconsistent verdicts or to employ relevant evidence in convicting on one count that it may seem to have rejected in acquitting on other counts'"), aff'd 237 F.3d 125 (2d Cir. 2001); Rust v. Eisenschmidt, No. 97-CV-615, 2000 WL 33767757 at *3 (N.D.N.Y. June 8, 2000); Dukes v. McGinnis, 2000 WL 382059 at *12-13; Billups v. Costello, 91 Civ. 6296, 1992 WL 170650 at *4 (S.D.N.Y. July 6, 1992) ("As long as a conviction is the result of a fair trial at which legally sufficient evidence has been adduced, its inconsistency with another verdict does not create a constitutional defect."); Savage v. Berbary, No. CIV-90-290E, 1991 WL 147371 at *2 (W.D.N.Y. July 22, 1991) ("Alleged inconsistencies in state court verdicts are not a proper ground for federal habeas corpus intervention. . . .").

_____    1.    **Appellate Counsel Was Not Ineffective for Failing to Argue Ineffective Assistance of Trial Counsel**

Mitchell's habeas claim that appellate counsel was ineffective for failing to argue that trial counsel was ineffective fails for two reasons.  First, trial counsel was not ineffective.  (see Point V.B above), and appellate counsel cannot be ineffective for failing to bring a meritless claim.  See, e.g., Steele v. United States, 04 Civ. 6918, 02 Cr. 629, 2005 WL 704868 at *15 ( S.D.N.Y. Mar. 29, 2005), report & rec. adopted, 2007 WL 162295 (S.D.N.Y. Jan. 19, 2007); Simms v. Moscicki, 06 Civ. 2056, 2006 WL 2466811 at *15 (S.D.N.Y. Aug. 25, 2006) (Peck, M.J.), report & rec. adopted, 2007 WL 162295 (S.D.N.Y. Jan. 19, 2007); James v. Artus, 03 Civ. 7612, 2005 WL 859245 at *16 (S.D.N.Y. Apr. 15, 2005) (Peck, M.J.); Gomez v. Duncan, 02 Civ. 0846, 2004 WL 119360 at *34 (S.D.N.Y. Jan. 27, 2004) (Peck, M.J.) ("It is well-settled that appellate counsel cannot be faulted for failing to raise a meritless claim."); Montalvo v. Annetts, 02 Civ. 1056, 2003 WL 22962504 at *30 (S.D.N.Y. Dec.17, 2003) (Peck, M.J.) ("Appellate counsel cannot be faulted for not raising meritless arguments as to trial counsel's effectiveness."); Maldonado v. Greiner, 01 Civ. 0799,  2003 WL 22435713 at *41 (S.D.N.Y. Oct. 28, 2003) (& cases cited therein).

Second, claims of ineffective trial counsel usually are brought not on direct appeal but via a collateral C.P.L. § 440 motion, and counsel is appointed for the direct appeal but need not bring a collateral § 440 motion for a defendant.[55/]  "'The proper procedural vehicle under New York

_____
[55/]    See, e.g., Otero v. Eisenschmidt, 01 Civ. 2562, 2004 WL 2504382 at *37 (S.D.N.Y. Nov. 8, 2004) (Peck, M.J.); Smalls v. McGinnis, 04 Civ. 0301, 2004 WL 1774578 at *32 (S.D.N.Y. Aug. 10, 2004) (Peck, M.J.); Guzman v. Fischer, 02 Civ. 7448, 2003 WL 21744086 at *16 (S.D.N.Y. July 29, 2003) (Peck, M.J.) (Appointed appellate counsel is not required to bring
(continued...)

law for raising a claim of ineffective assistance of trial counsel is generally not a direct appeal but

a motion to the trial court to vacate the judgement under New York Criminal Procedure Law Section

440.10.  This is so because normally the appellate court has no basis upon which it would be able

to consider the substance of such a claim until a record of the relevant facts has been made at the trial

court level.'"  Hernandez v. Filion, 03 Civ. 6989, 2004 WL 286107 at *17 n.36 (S.D.N.Y. Feb. 13,

2004) (Peck, M.J.) (quoting Walker v. Dalsheim, 669 F. Supp. 68, 70 (S.D.N.Y. 1987)), report &

rec. adopted, 2004 WL 555722 (S.D.N.Y. Mar. 19, 2004); accord, e.g., Otero v. Eisenschmidt, 2004

WL 2504382 at *33; Smalls v. McGinnis, 2004 WL 1774578 at *32.

### 2.    Appellate Counsel Was Not Ineffective for Failing to Argue That The Prosecution Failed to Timely Disclose Brady and Rosario Material

Mitchell argued in his coram nobis application that appellate counsel was ineffective

for failing to "raise the issue of a Brady violation for the D.A.'s failure to timely disclose to the

defense from the crime scene the bloody sandalwood and the lab test done on it. . . . The failure of

the police to gather and secure this evidence when they [f]irst came upon the crime scene is a clear

Brady violation."  (Dkt. No. 9: State Br. Appx. O: Mitchell Coram Nobis Pet. at 8c.)

As discussed above in Part V.B.4 above, the police's original failure to recover and

test the bloody wooden door saddle did not constitute a Brady (or Rosario) violation.  Appellate

counsel was not ineffective for failing to raise a meritless claim.  (See cases cited on page 80 above.)

---

55/      (...continued)
         a C.P.L. § 440 motion for petitioner.).

3.      **Appellate Counsel Was Not Ineffective for Failing to Argue That The Trial Judge's Statement during the <u>Huntley</u> Hearing About Trial Counsel's Performance "[P]rejudiced" Mitchell and Deprived Mitchell of his "[R]ights to a [F]air [T]rial and [D]ue [P]rocess"**

Mitchell's coram nobis application claimed that appellate counsel was ineffective for failing to argue that Justice Wittner's statement during the <u>Huntley</u> hearing , that she would testify on counsel's behalf if Mitchell ever raised an ineffective assistance of counsel claim, "prejudice[d]" Mitchell and deprived him of his "[r]ights to a [f]air trial and due process."  (Dkt. No. 9: State Br. Appx. O: Mitchell Coram Nobis Pet. at 8c.)

Mitchell has failed to allege prejudice, and there is not a "reasonable probability" that absent the judge's alleged statement, made outside of the presence of the jury and reflecting the judge's confidence in counsel's effectiveness, "the result of the proceeding would have been different." <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984).

4.      **Appellate Counsel Was Not Ineffective for Failing to Object to the Unconstitutionality of Mitchell's Enhanced Sentence as a Persistent Violent Felony Offender**

Mitchell's coram nobis application argued that appellate counsel was ineffective for failing to object to the alleged unconstitutionality of his enhanced sentence as a persistent violent felony offender pursuant to Penal Law § 70.08.  (Dkt. No. 9: State Br. Appx. O: Mitchell Coram Nobis Pet. at 4a, 5, 9a.)

New York's sentencing structure provides for enhanced sentences for second felony offenders, and for persistent felony offenders (<u>i.e.</u>, someone who has two or more prior felony convictions).  A second felony offender is, as the name implies, someone who has a prior felony

83

conviction.  Penal Law §§ 70.04, 70.06.[56/]  In such a case, the sentencing court must impose an

enhanced sentence, based solely on the fact of the prior felony conviction.

This Court has summarized New York's two persistent felony offender sentence-

enhancing statutes, as follows:

> New York has two sentence-enhancing statutes for persistent felony offenders.  One
> is the persistent violent felony offender provision in N.Y. Penal Law § 70.08, which
> practitioners of criminal law in New York often refer to as the "mandatory" one.  That statute
> applies to defendants who stand convicted of a violent felony (as defined in N.Y. Penal Law
> § 70.02) and have previously been convicted of two or more predicate violent felonies (as
> defined in N.Y. Penal Law § 70.04(1)(b)).  Such defendants receive an indeterminate
> sentence of imprisonment, the maximum of which must be life.  Minimum terms are
> prescribed by the statute as well and vary depending on the grade of the offense of
> conviction.  See N.Y. Penal Law § 70.08(3). . . .  Under § 70.08, "the court must impose" an
> enhanced penalty once it finds that the predicate convictions occurred, id. at § 70.08(2)
> (emphasis added), hence the use of the shorthand "mandatory" to describe that form of
> sentence enhancement.

> The second persistent felony offender statute is N.Y. Penal Law § 70.10.  This statute
> is designed to provide enhanced punishment for recidivists who fail to qualify as mandatory
> persistent violent felony offenders under § 70.08.  It characterizes as a "persistent felony
> offender" any defendant who stands convicted of a felony and has two prior felony
> convictions (whether or not they are for violent felonies) as defined in the statute.  See N.Y.
> Penal Law § 70.10(1)(a)-(c).  As an enhanced penalty for such offenders, § 70.10 provides
> that, in lieu of the sentence otherwise authorized by the penal law, persistent felony offenders
> "may" be sentenced as though the offense of conviction were a class A-1 felony.  Id.
> (emphasis added). . . .

James v. Artus, 03 Civ. 7612, 2005 WL 859245 at *15-16 (S.D.N.Y. Apr.15, 2005) (Peck, M.J.);

see People v. Cephas, No. 5473/01, 2003 WL 21783355 at *1-2 (Sup. Ct. N.Y. Co. May 23, 2003),

---

[56/]    Penal Law § 70.04 applies to second violent felony offenders, while § 70.06 applies to
second felony offenders other than second violent felony offenders.

84

aff'd, 26 A.D.3d 259, 809 N.Y.S.2d 78 (1st Dep't), appeal denied, 7 N.Y.3d 753, 819 N.Y.S.2d 879

(2006).

        Mitchell's ineffective appellate counsel claim is dependent upon whether New York's

mandatory violent felony offender sentencing statute, Penal Law § 70.08, is constitutional in light

of the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000),

and its progeny.  The Supreme Court articulated in Apprendi the rule that "[o]ther than the fact of

a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory

maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S.

at 490, 120 S. Ct. at 2362-2363 (emphasis added).[57/]  Penal Law § 70.08, under which Mitchell was

found to be a persistent violent felony offender, falls within this exception, i.e., the enhanced

sentence is based only on his prior felony convictions.  Thus, there was no Apprendi violation.  See,

e.g., Wicks v. Miller, 05 Civ. 5341, 2007 WL 1434992 at *8 (S.D.N.Y. May 15, 2007) ("The

petitioner's suggestion that his adjudication as a persistent violent felony offender violated Apprendi

is not tenable, because the Apprendi Court explicitly omitted the fact of a prior conviction from the

category of facts that must be determined by a jury. . . . [The Penal Law § 70.08 persistent violent

---

[57/]    See also United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 756 (2005) ("[W]e reaffirm our holding in Apprendi:  Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.") (emphasis added); Blakely v. Washington, 542 U.S. 296, 301-02, 124 S. Ct. 2531, 2536 (2004); Ring v. Arizona, 536 U.S. 584, 597 n.4, 122 S. Ct. 2428, 2437 n.4 (2002); Jones v. United States, 526 U.S. 227, 248-49, 119 S. Ct. 1215, 1226-27 (1999); Almendarez-Torres v. United States, 523 U.S. 224, 226-27, 118 S. Ct. 1219, 1222 (1998) (holding that sentence enhancement based on prior convictions does not violate the Constitution).

felony offender] enhancement depends only upon a finding that the defendant had certain prior felony convictions, which is precisely the kind of fact <u>Apprendi</u> and its progeny have explicitly omitted from their requirement that the jury determine facts that would result in a sentence greater than the prescribed statutory maximum."); <u>Alexander</u> v. <u>Ercole,</u> No. 06-CV-3377, 2007 WL 922419 at *7 (E.D.N.Y. Mar. 27, 2007) (upholding the constitutionality of New York's mandatory persistent violent felony offender statute, Penal Law § 70.08); <u>James</u> v. <u>Artuz</u>, 2005 WL 859245 at *18 (No <u>Apprendi</u> violation in Penal Law § 70.08 and thus appellate counsel not ineffective for failing to raise that claim on appeal.  Appellate counsel cannot be ineffective for failing to raise a meritless claim on appeal.  (<u>See</u> cases cited on page 80 above.)

Mitchell's ineffective assistance of appellate counsel habeas claims should be <u>DENIED</u>.


## CONCLUSION

For the reasons set forth above, Mitchell's habeas petition should be <u>DENIED</u> in its entirety, and a certificate of appealability should not be issued.


## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. <u>See also</u> Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain, 500 Pearl Street, Room 755, and to my chambers, 500 Pearl Street, Room 1370.  Any

H:\OPIN\MITCHELL-Elbert

requests for an extension of time for filing objections must be directed to Judge Swain (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:    New York, New York
          June 2, 2008

Respectfully submitted,

Andrew J. Peck
United States Magistrate Judge

Copies to:    Elbert Mitchell
              Susan Gliner, Esq.
              Judge Laura Taylor Swain

H:\OPIN\MITCHELL-Elbert